[Nos. 1888 and 1917]

B. A. GAMBLE AND F. S. CHADBOURNE, PLAIN-
TIFFS-RESPONDENT, *v.* L. J. HANCHETT, DEFEND-
ANT; LAURA C. WRIGHT, ERNEST WRIGHT,
AND ANNIE BEATRICE WRIGHT, DEFENDANTS-
RESPONDENT.

DeWITT CLINTON BLAIR, IN HIS OWN RIGHT, AND
AS ADMINISTRATOR, WITH THE WILL ANNEXED, OF
THE ESTATE OF JOHN I. BLAIR, DECEASED, SILVER
PEAK MINES AND THE SILVER PEAK GOLD
MINING COMPANY, DEFENDANTS-APPELLANT.

1. MINES AND MINERALS—OPTIONS—EQUITABLE RELIEF.
    Persons claiming an equitable interest in mining property
    under options after it has been made immensely valuable by
    the efforts of others must show good faith on their part, ability
    and readiness to perform their contract within the time fixed,
    and absence of laches.

2. MINES AND MINERALS—LACHES—MINING TRANSACTIONS.
    The doctrine of laches is not particularly applicable to min-
    ing transactions.   As to such properties, parties interested are
    required to be active and vigilant in asserting their rights.

3. LACHES.
    Facts reviewed are held to constitute laches.

4. FRAUD—EFFECT OF ON PROPERTY RIGHTS ENHANCED IN VALUE.
    If property has been acquired by fraud, or in utter disregard
    of the rights of others, and such property subsequently becomes
    of great value, the person defrauded would not for that reason
    alone be debarred from recovering possession, even though he
    reaped an increment entirely disproportionate to any efforts put
    forth by himself.

5. JUDGMENT—CONCLUSIVENESS.
    Where plaintiffs' rights in mining property under contracts
    were subordinate to those of another, they were cut off by judg-
    ments cutting off such person's rights.

6. IDEM.
    Where W. assigned an option in his name to H.; requested
    S., the owner of the property optioned, to deal with H.; accepted
    whatever interest he retained as subordinate to H.—a judgment
    obtained by S., cutting off all rights of H., under such option is
    binding on W.

7. MINES AND MINERALS—ACTION TO RECOVER INTEREST—EVI-
DENCE—SUFFICIENCY.

   In an action to recover interests in mining property under
   options, evidence *held* insufficient to sustain recovery on a theory
   of fraud, of continuing options, of the existence of a partner-
   ship, or of knowledge by defendants of the existence of such
   partnership.

8. JUDGMENT—FOUND IN FEDERAL COURT—CONCLUSIVENESS IN
STATE COURT.

   A judgment obtained in a federal court is not binding on par-
   ties litigant in a state court who were not made parties to the
   action in such federal court and whose rights were not subordi-
   nate to rights of a party or parties therein, and if deemed errone-
   ous may be disregarded.

9. APPEAL AND ERROR—STATEMENT ON APPEAL—NECESSITY.

   Absence of statement on appeal is unobjectionable where coun-
   sel have stipulated that the statement on motion for a new trial
   shall be considered as a statement on appeal.

10. APPEAL AND ERROR—STATEMENT ON APPEAL—SUFFICIENCY.

   Under Comp. Laws, 3864, which provides that a statement on
   appeal is presumed to contain all the evidence, a statement need
   not contain a certificate that it contains all the material evidence
   in the case.

APPEAL from the District Court of the Second Judicial
District of the State of Nevada, Washoe County; *W. H. A.
Pike*, Judge.

Action by B. A. Gamble and F. S. Chadbourne against
L. J. Hanchett, The Silver Peak Mines, and others. Judg-
ment for plaintiffs and defendants Wrights. The Silver
Peak Mines and others appeal. **Reversed.**

## STATEMENT OF FACTS

The mining properties sought to be affected by this
proceeding are situated in Esmeralda County and for
nearly a half century have been generally known as the
Silver Peak Mines. Prior to 1877 they belonged to a
corporation known as the Silver Peak and Red Mountain
Gold and Silver Mining Company, incorporated under the
laws of New York in 1866. This corporation, being
unable to meet its obligations, all of its properties were
sold in March, 1877, to John D. Vail and Charles E. Vail.

In September, 1877, the defendant company, the Silver Peak Mines, was incorporated under the laws of New York by John I. Blair and associates and the properties bought by the Vails were conveyed to it in return for stock issued to them.   This stock was later transferred to John I. Blair who thereafter owned the great· majority of the shares of the company; but some few shares were held by other parties who paid for them in cash at the time of the organization of the company.   Such parties were Chas. J. Canda, James R. Young, Clarence G. Mitchell, Chas. Scribner, Frederick Mead and DeWitt Clinton Blair.

The board of directors at one time or another included the following persons: DeWitt Clinton Blair, John I. Blair, Chas. J. Canda, Frederick Mead, Wm. H. Vail and Chas. Scribner.   Mr. DeWitt C. Blair was president and Mr. Chas. J. Canda secretary.

In 1879 the Silver Peak Mines, being indebted to John I. Blair in the sum of $204,000 for moneys advanced by him to that company for the purchase and development of its properties, gave him its seven bonds aggregating that amount, bearing interest at 10 per cent, and to secure payment of the same executed a mortgage of all its properties, which mortgage was thereafter recorded in Esmeralda County in May, 1880.

The corporation having no ready money, John I. Blair, from time to time after the issuance of the mortgage to him, advanced additional funds on its behalf, the amount of these advances in 1898 being about $68,000.   During this period the corporation also acquired additional mining claims which were not subject to the mortgage of 1879.

John I. Blair, who was born in 1802, resided in Blairstown, New Jersey, and subsequent to 1890 rarely left home, conducting his business affairs by correspondence and interviews with those who came to his home.   D. C. Blair and Chas. J. Canda, president and secretary, respectively, of the Silver Peak Mines, resided and had their offices in New York City.

In the spring of 1893, the plaintiff Gamble, then

unknown to any of the defendants except L. J. Hanchett, went to New York with letters of introduction to John I. Blair. He did not then or at any other time meet John I. Blair, but had several interviews with Chas. J. Canda and also met D. C. Blair. While in New York the plaintiff Gamble addressed a letter, dated New York, March 6, 1893, to "Messrs. Blair, Canda, *et al.*," proposing to purchase the property of the Silver Peak Mines for the sum of $450,000, subject to the provisions of an option requested to be given upon the property, "extending over a period of eight months, with full privilege to enter on the property to investigate it and make milling tests."

In response to this proposition of the plaintiff Gamble, Mr. Canda obtained for him from John I. Blair the following letter: "Blairstown, N. J., March 9, 1893. B. A. Gamble, Esq.—Dear Sir: I hereby offer to sell to you all the shares of the Silver Peak Mines, a company organized under the laws of the State of New York, owning gold and · silver mines in the Silver Peak and Red Mountain Mining Districts, Esmeralda County, Nevada, also the mill property at Silver Peak, for the price of five hundred thousand dollars ($500,000), to be paid as follows, viz: Two hundred thousand dollars ($200,000) on or before the first day of November, 1893, and the balance at the rate of one hundred thousand dollars ($100,000) semiannually with interest at six per cent (6 per cent), on the balance of the purchase money remaining unpaid, said balance of purchase money to be secured by mortgage on the property. Such company to be free and clear of all other indebtedness. You are to be at liberty to thoroughly investigate the property, to make any surveys which you may desire, to mine ore from the gold mines and work it in the mill, the resulting proceeds of such workings to be paid to the Silver Peak Mines, unless you shall purchase the property, in which case the same is to become a part of the purchase money. Any work that you may do on the mines, and all and every expense of any kind that you may make or assume, is to be for your own account,

and neither the Silver Peak Mines nor myself are to be under any circumstances chargeable with any part of it. And in all your dealings proper notice is to be given that the work done by you or by your agents is for and on your own account, and that the company will not be responsible for any work done nor any supplies contracted for by you. It is specially understood that unless two hundred thousand dollars ($200,000) of the purchase money shall be paid on or before the first day of November, 1893, and a contract entered into for the payment of the balance of the purchase money, this letter shall be void and of no effect.    Yours truly, John I. Blair."

On March 7, 1893, C. J. Canda wrote to M. F. Tarpey of Alameda, Cal., the following letter: "No. 11 Pine Street, New York, March 7, 1903 (1893). My dear Mr. Tarpey: Being interested with Mr. John I. Blair in the Silver Peak and Red Mountain Mines of Nevada, your letter to Mr. Blair, dated 20th inst. (ult.), introducing Mr. B. A. Gamble, has been delivered to me, and I have had two conversations with Mr. Gamble. He wants us substantially to give him an option on our mines until November next, with a right to enter upon them, work the ores, etc.—in other words, to make a full and exhaustive examination before he determines whether he will buy it. I presume it is right that he should have such opportunity, but as he declines to give anything for the option we think that we ought to be particular to know with whom we are dealing. Mr. Gamble has given me, besides your name, the names of Messrs. R. B. Milroy and W. W. Johnson of San Francisco, and John Gallagher of Mason Valley. He admits that there are other parties to be interested with him, but states that he is not at liberty to give their names. Your letter introducing Mr. Gamble is very well as far as it goes, but you do not say anything as to his integrity, methods of dealing, etc., so that I have concluded to ask you to give me all the information that you can about Mr. Gamble. We feel that in turning over the property to him in the way that he wants it, we ought to

know all about him. I shall be very glad if you will write me as fully as you can, confidentially, or otherwise, as you may please.    *    *    *"

The plaintiff Gamble replied to the letter of John I. Blair of March 9th, as follows: "New York, March 11, 1893. Hon. John I. Blair—Dear Sir: I hereby acknowledge receipt of your letter of 9th inst., of which the foregoing is a copy, and I hereby agree in good faith to thoroughly investigate the property with a view to purchasing the same on the terms stated. Yours truly, B. A Gamble."

On March 25, 1893, C. J. Canda wrote to the plaintiff Gamble in San Francisco the following letter: "Dear Sir: Since I saw you I have seen Mr. Tarpey, who arrived here a few days ago on his way to Washington. I am glad to say that he tells me that the transactions that he had with you were entirely satisfactory to him. Of course it is pleasing for us to know this. I should be very glad if you would write me from time to time keeping me informed, so far as it is proper for us to know, what progress you are making, and I should like to know, also, if you can consistently tell me, the names of all the parties associated with you in the proposed Silver Peak purchase. You can, of course, appreciate that it will be satisfactory for us to know this. The information can be entirely confidential, if desired. Of course I have not written to Mr. Wasson. I am waiting to hear from him that you have delivered him the letter. If I could know just when you were to deliver him that letter, I might properly write him at a time so that he would get another letter from me at about the same time or very soon after."

On May 23, 1893, C. J. Canda wrote to the plaintiff Gamble as follows: "Dear Sir: I have just received a letter from Mr. Wasson, dated May 17th, from which I learn that you have visited Silver Peak, remaining there only two or three days. I had supposed that by this time you would be doing some active work there, with a view of informing yourself as to the value of the property. I

am very curious to know whether you succeeded in acquiring the Chiatovich Ranch and whether you are otherwise prepared with a view of availing yourself of the option which was given you.   Kindly let me know."

On the 5th day of August, 1893, the plaintiffs Gamble and Chadbourne entered into the following agreement:

"For value received I have on this fifth day of August, 1893, sold, conveyed, transferred, assigned and set over to F. S. Chadbourne, of San Francisco, an undivided one-half interest of all my right, title, property, options, privileges, gains and profits in or hereafter arising or to arise from any and all transactions, operations and business embraced in and contemplated by the terms of the within instrument, executed by John I. Blair, on the date of March 9, 1893.   And I have, on this fifth day of August, 1893, made, executed and delivered to said F. S. Chadbourne, a duplicate of this agreement and transfer, which I declare to be in effect, and for all intents, uses and purposes as if such assignment were made on such original instrument now and hereby endorsed, signed, made and executed by me.   Witness my hand the day and year first above written.   B. A. Gamble.   F. S. Chadbourne."

On August 11, 1893, plaintiff Gamble wrote to C. J. Canda as follows: "Dear Sir: I leave tonight for Silver Peak, with two experts and parties interested, to make final examination.   Owing to the financial conditions of affairs, I have been unable to get my people together until now.   You will hear from me on my return."

On August 18, 1893, Canda wrote to Gamble as follows: "Dear Sir: I have received your favor of the 11th inst. and am very glad to learn that you are about to visit Silver Peak with two experts and the parties interested to make a final examination of the property.   I trust that such examination will prove satisfactory and that you will communicate with me again on your return."

On August 28, 1893, Gamble wrote to Canda a letter in which he says: "I have just returned with the parties interested with me in the purchase of Silver Peak.

They took three of the very best experts in this western country there. They were J. J. Crawford, State Mineralogist, H. J. Roar of Placerville and Jeff Doolittle.   *   *   * (Here follows description of the condition of the property as a result of the examination.)   In the condition your property is now all you have to show is worked-out stopes, valueless dumps and barren croppings; under these circumstances everything depends on future development.   The contract that I now have is too high priced, as you have nothing to sell but future possibilities.   The people interested were prepared to take your property at the price, if the property showed that valuation; but it does not.   If you will modify the contract, we will give you one of the best companies in the state and will develop these mines systematically, that will cost in the neighborhood of one hundred thousand dollars.   The parties interested will be very satisfactory to you, some of whom were out to see the property.   They were F. S. Chadbourne of this city, representing himself, Frank McLaughlin of Santa Cruz, J. B. Wright of Sacramento, Jeff Doolittle, representing Doolittle & Gould of Nevada City, D. A. Bender of Carson City, Nevada, representing D. O. Mills.   The proposition to bring water to these mines from the White Mountains is an absurdity, as there is nothing there to bring water for; if the mines develop then that could be done, but now it would be a very unwise thing to do.   Enclosed you will find a copy of assays."

To this letter Canda replied of date September 11, 1893, as follows: "Dear Sir:   I have just received your favor dated August 28th, postmarked San Francisco 5th inst., and I note all that you say.   Under the circumstances, you will not, of course, avail yourself of the option which Mr. Blair gave you, and I will be obliged if you will cancel it and return it to me.   Of course it will expire on the 1st of November, but as I have a party here desiring to negotiate for the property I should like to have this option back, that I may be free to deal with him."

On October 10, 1893, Gamble wrote to Canda as fol-

lows: "Dear Sir: If you will send any well-known expert to Silver Peak and he does not report the condition of the property exactly as we did, we will agree to pay the expenses of his report. We had an examination made by three of the best experts here at a cost of $2,600, and they would not recommend the purchase under the contract I hold; however, they did not say there was not a mine there, or a show for one. We consider that we have acted in good faith with you, spent our own money for examination, which is not done by any one, either in this country or England; therefore, we ought to be considered, firstly, if our proposition is as favorable as any one else. No one will purchase the property until first examining it, and then their proposition will not be any better than ours, besides, all this takes time. We will give you $500,000, payable $100,000 per year, and will erect mill and hoisting works, etc., all to revert to you, in case we do not fulfil the contract. If you think favorably of this proposition, Messrs. Tarpey and Chadbourne will go to New York to confer with you."

On October 17, 1893, Canda wrote to Gamble as follows: "Dear Sir: I have received your letter of 10th instant and thank you for the same. As I wrote you on the 11th ultimo, a party here desires an option on our Silver Peak property and we desire to give it to him, unless you are to purchase it. Believing that you have acted in good faith we desire to deal with you; on receiving proper assurances that you will erect mill, works, etc., we would be willing to give you more time in which to make payment than provided in the contract which you hold. We will therefore be pleased to see Messrs. Tarpey and Chadbourne if they will come immediately. You will understand that under the circumstances that we have a possible buyer anxious to make examinations of the property, we should not be asked to run the risk of losing an opportunity of selling. If you will telegraph me on receipt of this that your agents are coming, I shall hold the matter open. If I receive nothing from you before the 1st November we will consider the matter at an end."

On October 25, 1893, Gamble telegraphed to Canda, as follows: "Will start with Chadbourne for New York November 1st or before."

On October 30, 1893, plaintiff Gamble signed and delivered to F. S. Chadbourne and J. B. Wright the following receipt and agreement: "San Francisco, Cal., Oct. 30, 1893. Rec'd of F. S. Chadbourne and J. B. Wright the sum of two hundred and fifty dollars and transportation to Chicago and return, for which I agree to go to New York and try to obtain a bond on the Silver Peak Mining Co. property, situated in Esmeralda Co., Nevada, from Jno. I. Blair, and I hereby agree to transfer to said Chadbourne and Wright a one-third interest each in such bond as I may acquire.   B. A. Gamble." Endorsed: "Receipt from B. A. Gamble for $250, Oct. 30, '03."

On November 1, 1893, Gamble wired to Canda from Sacramento as follows: "I leave tonight, will be on hand Monday morning."

On November 13, 1893, J. I. Blair wrote to plaintiff Gamble as follows: "Blairstown, N. J., November 13, 1893. Dear Sir: On the condition that you will before the 31st day of December next secure the incorporation of a company contemplated in the annexed draft of contract—the subscription to the capital stock to be by parties of acknowledged responsibility and satisfactory to me—I hereby promise and engage to secure the execution of said contract by said Silver Peak Mines. Yours truly, John I. Blair."

The annexed draft of contract, accompanying the said letter of November 13th, was substantially in the same form as the Hanchett option hereafter set out.

On December 7, 1893, Gamble wrote to Canda the following letter: "Dear Sir: We have incorporated the 'Silver Peak Gold and Silver Mill and Mining Company' with a capital of $2,000,000. The articles of incorporation will be returned from Sacramento the middle of next week. As I told you while in New York that I did not think the time sufficient. I now find this to be the case, owing to the holidays and the first of the year being so

near at hand; besides, the midwinter fair is occupying everyone's time and attention; especially with the R. R. people.   We expect to have Geo. Crocker take a 'block' of stock, as I told you, and we cannot reach him until after Jan. 1.   We want sufficient time to make a good, strong company, and not jeopardize our plans, therefore we suggest that the time be extended to Apr. 1, '94.   As soon as papers are returned from Sacramento you will receive official communication from Pres. of Company, F. S. Chadbourne."

On December 13, 1893, Canda wrote to Gamble as follows: "Dear Sir: I have to acknowledge the receipt of your favor of 7th inst., and I note what you say.   While I can understand that for the reasons that you state you require a little more time to secure subscriptions to the proposed company, I do not see why it should be necessary to give you until the 1st April next, nor do I think that Mr. Blair would be willing to do so.   I am writing him today asking him to give you until the 1st of February, which I have no doubt he will be willing to do.   I will write you as soon as I hear from him in reply."

On December 15, 1893, Canda transmitted to Gamble the following letter of John I. Blair: "Dear Sir: Confirming my letter of the 13th ultimo, I hereby agree that you shall have until the first day of February, 1894, to fulfil the conditions expressed in my said letter."

On January 2, 1894, Canda wrote to F. S. Chadbourne as follows: "Dear Sir: I have duly received your favor of twenty-third ultimo and note what you say.   I regret very much that you did not come on with Mr. Gamble last fall. As it was I thought I had made it clear to him, and also in the proposed contract, copy of which he took with him, as to just what Mr. Blair is willing to do.   It seemed as if it would not be possible to have individual parties assume the responsibilities which would naturally be required by the seller, so the suggestion was made that a corporation be organized with a limited liability which would have shares enough subscribed by responsible parties to satisfy Mr. Blair.   Of course, all this was done

on the supposition that you had examined the property
last summer and were satisfied to go on with the busi-
ness.    I did not know until the receipt of your letter that
you had not had the fullest opportunity to investigate
the property in every way.    Indeed, Mr. Wasson was
instructed to allow Mr. Gamble to mine ores and reduce
them in our mill if he saw fit to do so, and he was also
instructed to give him every assistance possible in the
way of information and advice; that you may see just
what he was directed to do, I send you enclosed copy
of a letter to Mr. Wasson, which was handed to Mr.
Gamble, and which I believe he never delivered to Mr.
Wasson.    Indeed, Wasson wrote me that Mr. Gamble's
examination was very hurried; that he and his party
remained at the Peak over one night only.    As I have
repeatedly stated to Mr. Gamble we do not expect him
and his friends to purchase the property until they are
entirely satisfied that it is valuable, and we have desired
to give him every opportunity to satisfy himself; indeed,
he has now had over nine months to do so.    Mr. Wasson
is employed at ninety dollars per month to look after the
property and to keep us advised.    I believe Mr. Blair
permitted him last year to do some little work on the
mines, which may not have been entirely wise, but it has
enabled him to take care of the property without cost to
us; indeed, he has remitted us some little money.    Mr.
Harris was sent to Silver Peak some years ago as assistant
treasurer of the company at a salary.    He has been there
so long and has made so many locations of his own that
he seems to have concluded that he owns the whole
country, but after all he is only a visionary crank.    We
owe him nothing whatever; indeed, he is a defaulter, as
I am informed, from one of Mr. Blair's companies by
which he was formerly employed.    I know nothing of
Mr. Chiatovich 'claiming the buildings at the mine.'
There are, so far as I know, no buildings at the mine that
have any great value.    As I have stated to Mr. Gamble,
we have a party who is very anxious to take up the Silver
Peak business.    We have gone on with Mr. Gamble

because we believe that in good faith he had investigated the property and that he was ready to act upon, and we want to go on with him if he will satisfy us that the company which he has organized has secured the subscriptions to its capital stock as per Mr. Blair's letter, and that such company is ready to enter into the proposed contract.   On the other hand, if he will not do so promptly, we want to go on with this other party, not desiring to fall between two stools.   Under these circumstances I shall hope to hear promptly what are your and his intentions as to entering into the contracts as proposed in Mr. Blair's letter of November 13, 1893."

On January 12, 1894, Gamble wrote to Canda, as follows:  "Dear Sir: I read your letter to Col. Chadbourne today and after digesting the contents have concluded that the quickest way to adjust this whole matter is for Chadbourne to go to New York—then you can understand what he wants, and, besides, know with whom you are doing business.   Their idea is to place this scheme on a firm foundation from the start, and in order to accomplish this they are willing to spend their money to open up the mines, and place the property in shipshape condition.   Then they can get a report from an expert (which will have a commercial value) after which they will have no trouble in raising money.   Under the conditions of the proposed contract that we now hold, they are in a position to be 'dictated to' by outside parties, which, of course, they wish to avoid.   The desired change in the contract will not materially change your position in contract, but ours.   You stated in your letter to Chadbourne that I had a letter from you granting me the privilege of making any examinations that I saw fit, which is true, but that I failed to deliver said letter is not true.   I was at the mine one week, but when Chadbourne and party went out they remained but two days, because his three experts assured him that the property was not worth the money under the contract I had.   Wasson does not want you to sell the mine, for the simple reason that he wants to 'work' it himself, and impedes the progress

of any examination. I am satisfied that if you offer the suggestion with which I opened this letter, Mr. Chadbourne will act upon it and go to New York, and this matter can be settled satisfactorily, to all, and at once. You will, of course, consider this suggestion as confidential, for which no reply is necessary (to me). My private address is 309 5th St. If you act upon my suggestion, and at once, I am sure it will have the desired effect."

On January 18, 1894, Canda wrote to Gamble as follows: "Dear Sir: I have just received your letter of 12th instant and I note what you say. There will be no necessity of my writing to Mr. Chadbourne, as you suggest, as I have a letter from him, dated Sacramento, January 12th, in which he says: 'We have about reached the conclusion that, in order to do anything it will be necessary for some of us to go New York and have a talk with you. It is utterly impossible for me to get away at the present time and we have concluded to send on Mr. L. J. Hanchett. I will write you additional in a day or two.' I am fearful that all this will make delay, which is somewhat embarrassing, for we have two parties wishing to enter into negotiations with us for the Silver Peak property. One is a gentleman from Colorado, who is a very rich man and competent to handle the property alone; the other is the party concerning whom I have heretofore spoken to you, who seems to develop strength that I had not known him to possess. I trust, under the circumstances, that Mr. Hanchett will manage to come at once, that it may be definitely settled whether we are to do business with your parties or not."

L. J. Hanchett visited New York and as a result of his negotiations with C. J. Canda, the following letter from John I. Blair to John B. Wright was secured: "Blairstown, New Jersey, February 2, 1894. Dear Sir: On the condition that you will, before the first day of May, 1894, secure the incorporation of a company contemplated in the annexed draft of the contract—the subscription to the capital stock to be by parties of acknowledged responsibility and satisfactory to me—I hereby promise and

engage to secure the execution of said contract by said Silver Peak Mines.    Yours truly, John I. Blair.    John B. Wright, Esq."

The annexed draft of contract referred to in Blair's letter of February 2, *supra*, differed from the Gamble option of November 13, 1893, only in reference to the work to be done upon the property under the option; the Wright option, containing a provision for minimum amount of development work to cost at least $30,000, to be commenced not later than May 15, 1894, and to be continued without interruption until at least $30,000 was expended.    In the Gamble option was a provision for sinking a certain shaft at least five hundred additional feet.    There were also some other minor modifications; the contract being, in the main, similar to that of the Hanchett contract hereafter referred to.

On April 24, 1894, J. B. Wright wrote to C. J. Canda the following: "Dear Sir: When your brother, Mr. Ferdinand E. Canda, was in California, I had several talks with him in regard to the Silver Peak Mines, and the difficulties encountered of handling a property of such magnitude at this particular time.    I explained to him what I desired to do, and he very kindly interested himself in the matter to the extent of volunteering to present the same to you relative to an extension of the option.    On April 4th, I wrote to Mr. F. E. Canda, and stated briefly what I proposed to do in accordance with the understanding we had while he was here, and asked him to kindly present my request to you, giving him details as reasons therefor, and so forth.    On the 15th of this month, I received a letter from him in which he seemed to think nothing in that direction could be done as other parties were anxious to obtain an option; and furthermore from the fact that Mr. Gamble had had the property so long himself and no work had been done towards developing it.    I wish to say in regard to Mr. Gamble that about this time last year I commenced to figure on obtaining an option or bond for myself and associates for the Silver Peak property, and found Mr. Gamble was in possession of one.    I really had

had no connection with Mr. Gamble until about the last of October, a month or so before the first option expired. You will remember Mr. Gamble went to New York to obtain an extension to February 1st, and afterwards Mr. L. J. Hanchett obtained an additional extension to May 1st. The financial situation on this coast has been peculiarly unfortunate, but within the last few months it has steadily and gradually been growing better, and I now desire to make application to you for an extension of ninety days on an option from May 1st. I feel satisfied that in sixty days I can determine definitely whether myself and friends can handle the property, and I assure you that if I find by that time there is not a reasonable prospect of our taking hold and commencing work in a proper way, I will be only too glad to surrender my option and not claim the full time. As I explained to F. E. while here, my idea of doing the work at the Silver Peak would be to put in considerable of a plant, and, of course, this would take much money. I am satisfied it would not do to attempt to commence in a small way. The result looked for could not be thus accomplished. Should you grant me the ninety days I ask for, I shall continue the work.I am now engaged in, and which I expect to bring to a successful conclusion."

On May 4, 1894, C. J. Canda wrote to Wright as follows: "Dear Sir: Your letters of the 24th and 26th ult. addressed to me, and of 25th addressed to my brother F. E. have been received, and contents noted. You understand, of course, that the contract which you have from Mr. Blair gives the option to purchase the Silver Peak property at any time before January 1, 1895, the only condition being that you will before June 1, 1894, organize a corporation with $30,000 of available funds which you and your friends are to expend in satisfying yourselves as to whether you desire to purchase the property or not. Now it does seem if Mr. Jones, who has lately gone to Silver Peak, reports favorably, that you ought to be able to organize such a corporation within a week. Certainly the risk you would run would be limited, and

divided up between your associates would be very inconsiderable. As I have repeatedly said, we are entirely satisfied with your party and would very much prefer to deal with you than any one else; at the same time we cannot ignore the fact that several parties have asked us for bonds on this property, one of whom I know to be abundantly responsible, but we do not want to start all over again from the beginning. We would much prefer to go on with you and we will give you any reasonable time that you are willing to work at it, but we do not wish to waste the summer season necessary for making proper examinations and then find that we must extend the option beyond January 1, 1895. I note that you say that you have only lately become interested. This is true, Mr. Gamble having mentioned your name to me only last November, when he secured the first renewal, but Mr. Chadbourne's name was mentioned when Mr. Gamble came here over a year ago and he, as I am informed, is one of your most influential associates. As I understand the situation, I do not think I ought to ask Mr. Blair to extend the time for organizing the proposed corporation until August 1, 1894. Certainly before I do so I should be informed as to the report of Mr. Jones and as to what we may expect should Mr. Blair consent to such long extension. I would again assure you that we would prefer to deal with you and we will give you all reasonable extensions necessary, but we must feel that the time is being employed in work. You have indeed a very favorable contract, one that you could not have secured had Mr. Blair been a man under 50 years of age, but being now in his 93d year and the rest of us being engrossed in affairs here and unable to give the property any attention whatever, it was decided to sell it. To that end I wrote the contract in that way which seemed to me would be very attractive to proposing buyers. I hope sincerely that you will avail of it."

On May 14, 1894, B. A. Gamble wrote to C. J. Canda the following letter: "Dear Sir: I have just returned from Silver Peak, having gone out with John P. Jones's expert

W. H. Stanley, to make an examination.    Mr. Stanley has not returned as other business prevented.    It will take some time after his return to get a final decision from Mr. Jones, therefore it is imperative that the 'time' should be extended, although Mr. Wright told me this morning that you had refused a further extension.    There are many impediments that will be carefully considered by Mr. Jones as well as the favorable points, before this decision is arrived at.    This man Harris is certainly going to cause trouble.    He has written all of our people that you are trying to 'bulldoze' him, and that you are afraid to dispossess him; also furnishes copy of correspondence between John I. Blair, Bruntan, *et al.*    Mr. Jones's secretary told me this morning that Harris has written him (Jones) a letter covering forty (40) pages, warning him against purchasing the Silver Peak Mines.    Harris also writes to us that he is about to publish an open letter to John I. Blair daring him to action in S. F. papers.    Chiatovitch is also doing everything possible to prevent the sale, and your own man, likewise.    They write you that they will do all possible to help the sale, but in reality do just the opposite; they take particular pains to explain all the bad features of the mines, and then take the expert to show him how the wind blows all the 'tailings' away.    Any purchaser who may go to your property and is not protected by one familiar with the facts, will certainly condemn your property after one interview with Chiatovitch, Harris or Wasson.    You ask a big price for your property.    It has many impediments, therefore requires careful consideration, and if the sale is not made it will not be our fault.    As you must know, the property is now under the consideration of one of the wealthiest mining firms on the Pacific Coast."

On May 22, 1894, Canda wrote to Gamble as follows: "Dear Sir: I have received your favor of 14th instant. If your parties are to be so impressed by Mr. Harris that they will not consider the Silver Peak property on its merits, they are not what I have taken them to be, nor do

I believe that their decision will be based on what Mr. Chiatovich may say to them."

On the same day, May 22, 1894, Canda wrote Wright as follows: "Dear Sir: I have just received a letter from Mr. Gamble, of which the enclosed is a copy. I also send you a copy of my reply to him. As I have said to you, we are in earnest in our desire to deal with you and your associates, and I am proposing to hold the matter open a reasonable time to learn from you definitely what can be done. I trust that you will expedite the business to the utmost, and that we may come to a definite and satisfactory understanding to both sides."

On June 4, 1894, Wright wrote to Canda as follows: "My Dear Sir: I received your telegram relative to the extension on Silver Peak option to July 1st. I am much gratified that you could see your way clear to grant this further extension and assure you that I am endeavoring to expedite matters with the Jones people with a view of bringing things to a focus as soon as possible. I think you fully realize that a transaction of this magnitude is hard to bring to a termination within so short a time as we would wish for. Mr. Hanchett is at present in New York. I have wired him today to go to Washington and see Senator Jones and try and have this matter settled at the earliest possible date. I have also written him specifically, and requested him to call upon you and explain fully relative to what Senator Jones will probably do."

On June 19, 1894, Canda wrote to Wright as follows: "My Dear Sir: I duly received on the 9th inst. your esteemed favor of the 4th and I have, as you doubtless know by this time, had a full conference with Mr. Hanchett. As the result of this conference I have secured the execution on the part of the Silver Peak Mines of the enclosed proposed contract with you, which I send in duplicate. If it meets your approval, kindly execute both copies and send one of them back to me; if, on the other hand, it does not meet your approval, please return both copies to me. You will notice that there has been a very

slight change in paragraphs 6 and 7 from the copy which Mr. Hanchett took with him. This change was inserted to please Mr. Blair. As you are doubtless aware, I am very anxious that you should have a full opportunity in this Silver Peak matter, and I must say I think we have given you a very favorable contract, with ample time to carry it out. I trust that you will see your way to push the business to a favorable close. But if for any cause you have reached a point where you do not see your way to purchasing the property, I hope that you will return the contracts to me at once that we may undertake the sale with other parties. On receiving this contract duly executed by you I will give you the necessary orders on Mr. Wasson contemplated by the contract."

. On July 27, 1894, Canda wrote to Wright as follows: "My Dear Sir: Your letter of June 27th was received on the 17th instant, but owing to my absence and the absence of the Messrs. Blair in turn, I have not been able to bring the business to a head until today. I send you enclosed the proposed contract as we have modified it and hope sincerely that in this form it will be satisfactory to you. Mr. John I. Blair is just about entering his 93d year, and while he has enjoyed very good health until lately, his family are opposed now to his entering into any covenants, so that I have been obliged to eliminate his name as a party to the contract. He will of course agree, however, to turn over his stock and will quitclaim to you his interest in the property when you will have paid for the same. To that end I have prepared a letter, of which the enclosed is a copy, which I am sending for his signature. Other than making Mr. Blair a party, I think we have substantially conceded all that you suggested. We think that we turn over the property to you in such an unreserved way that at least thirty thousand dollars ought to be spent upon it, believing as we do that if you will spend this sum you will be ready to purchase the property. We appreciate the difficulties of the business situation generally and are ready to give you every reasonable time growing out of that. We believe that if you work

this thing earnestly you will succeed and we will find a
purchaser for our mines.   We have held these mines since
1866 and we do not see how there can be any question as
to the title, particularly as most of them and the best
mines have been patented to the company.   But litiga-
tion is always possible and it is right that you should
protect yourself in that regard.   We will of course defend
them until you are satisfied to pay for them.   I return
you herewith one copy of the contract which you had
executed and your signature from the second copy, which
latter I retain for our files.   Please return to me the two
executed copies of the contract sent you on June 19th,
and oblige."

The proposed contract referred to in Canda's letter of
July 27th, *supra*, in form, was identical with that subse-
quently entered into between the Silver Peak Mines and
L. J. Hanchett, of date September 7, 1894, the one in con-
troversy, hereinafter set out, excepting as to the date
the party of the second part was to be put into pos-
session and commence development work, which was
August 1, 1894, in the Wright contract and October 1,
1894, in the Hanchett contract, and the time in which he
may elect to purchase August 1, 1895, and December
31, 1895, respectively, and the dates of payments pre-
scribed accordingly.   The provision in the "twelfth" par-
agraph of the Wright contract, that the minimum amount
of development work to be done shall cost at least $30,000,
is stricken out in the Hanchett contract, and in lieu
thereof, a provision is inserted that the second party shall
explore and develop the property with a view of deter-
mining to his own satisfaction the value thereof.

On July 31, 1894, Canda wrote to Wright, transmitting
the following letter of John I. Blair: "Blairstown, N. J.,
July 27, 1894.   Dear Sir: Referring to the certain con-
tract entered into between the Silver Peak Mines and
yourself, dated June 23, 1894, I hereby stipulate and
agree, in the event that you shall exercise the option
given you in said contract to purchase the property
belonging to said company, to deliver to you, or to your

assigns, on the completion of said purchase, all the shares of the capital stock of the said Silver Peak Mines. Yours truly, John I. Blair.    John B. Wright, Esq., Sacramento, Cal."

On August 22, 1894, Canda wrote to Wright as follows: "I have sent Wasson order required, but you have not sent contract nor acknowledged its receipt."

On September 5, 1894, Wright telegraphed to Canda as follows: "On account of pressure of company business caused by the late strike I find that I will not be able to personally attend to Silver Peak business and will place it entirely in the hands of Mr. L. J. Hanchett to personally supervise and manage.    On that account would like much to have the bond made in his name instead of mine. If this is agreeable will write fully enclosing bond signed by Hanchett on receipt of your reply."

To which Canda answered, September 6th, as follows: "Telegram received.    With assurances that the money to develop as provided in contract will be furnished, Mr. Hanchett will be satisfactory."

On September 7, 1894, Wright wrote to Canda as follows: "Dear Sir: Referring to my telegram of September 5th in regard to Silver Peak and Mr. Hanchett, as stated therein, I have been so burdened with work caused by the late strike of this company's employees that it has been an utter impossibility to give the question the attention it requires.    The duties that have been imposed upon me by the company have kept me on the road traveling most of the time, and I shall also be very busy for perhaps thirty days longer.    As I was unable to attend to this matter and Mr. Hanchett was very anxious to take hold of it and form a company to operate the mines, I wired you accordingly.    Mr. Hanchett has written you by this mail and I believe enclosed a contract changed in some respects, but I am not informed as to the changes he has made or as to the exact purport of the letter, but I desire to say that if the changes he suggests meet with your approval it is agreeable to me, but if you do not desire to entertain his proposition I will immediately

take up the contract as it now stands and push it to a conclusion or surrender the same. I expect to go to New York myself in November and hope to have the pleasure of talking over this Silver Peak matter with you at that time. Money has been so tight here that it has been absolutely impossible to interest capital in any investment. But as matters become more settled I feel certain that there will be a change for the better in this respect, and it will not be a difficult matter to float this enterprise within the next sixty days. As I have said before, if you do not care to accept Hanchett's proposition, I will take the matter right in hand and bring it to a conclusion of some kind at once."

On September 8, 1894, Hanchett wrote to Canda as follows: "Dear Sir: Referring to Mr. Wright's telegram of September 6th to you and your answer, would say I have parties ready to put up the money required to start the Silver Peak Mines, but cannot see my way clear to commence work with the bond as it now stands. There are too many people in the bond, on our side, who want a share, but who will not put up any money. For that reason Mr. Wright telegraphed you to change the bond to my name, as that will reduce the number interested so that agreements can be reached and work commenced. I am to look after the interests of Mr. Wright and the ones directly interested; that is, the ones who have put up the money or have taken an active part in raising it. All of this above so that you will understand why I am delaying and why I want the bond transferred to me. The bond sent herewith is as near as I can make it to the one we drew up while I was in New York. This bond differs principally from the one referred to before in that it makes the payments come due on the 1st of October instead of August, and differs from the one now in effect in the matter of the $30,000 clause which I could not think of agreeing to, although we will have to spend many times that amount before we can do anything at all * * * I do not apprehend any trouble in getting the money when Mr. Crocker returns from Europe (which

will be in November) to put in more stamps and make many extensive and necessary repairs. The extension of time in the enclosed bond I feel sure you will consider no more than right when you take into consideration the unavoidable delay we have been put to in many ways, not the least of which has been the extreme distance the contracting parties are apart. It would be no use taking any one to see the mines in their present condition. Please let me know as soon as possible, and by telegraph if you will sign this bond. If this bond and the arrangements now proposed are not satisfactory to you, I shall feel compelled to sever my connections with the affair."

The contract proposed by Hanchett and agreed to by Silver Peak Mines is as follows:

"Articles of agreement made and entered into this seventh day of September, 1894, by and between the Silver Peak Mines, a corporation, existing under the laws of the State of New York, party of the first part, and L. J. Hanchett of the City of Sacramento, State of California, party of the second part, as follows:

"The said parties hereby covenant, promise and agree to and with each other as follows:

"That the party of the first part being the owner of certain mines and mining claims, gold and silver, situated in Esmeralda County, in the State of Nevada, hereby proposes to sell the same to said party of the second part on the following terms and conditions:

"First—All of said property to be placed in the possession of the said party of the second part on or before the first day of October, 1894.

"Second—The party of the second part to have full control of all the said property, as well as all other effects of the party of the first part in said County of Esmeralda, for the period ending December 31, 1895.

"Third—The party of the second part to have license to enter into and upon all of said real estate, make excavations thereon, take out any and all ores found on or in any of said mining claims; control, use, occupy and enjoy all fixtures, mills, houses, offices, storehouses, machinery,

corrals, boarding-houses, blacksmith shop, and all other improvements and property of the party of the first part in said county during said term ending December 31, 1895.

"Fourth—The object of said occupation and enjoyment by the party of the second part of said property being to develop the mines situate in said property by sinking shafts, running tunnels and drifts, opening and working the said mines for gold and silver ores, the said party of the second part shall have full right, power and authority to explore for and work such mines, taking care to work the same according to the best known methods and keeping. all such excavations well timbered.

"Fifth—All minerals taken from said mines by the party of the second part shall be in charge of the party of the second part, and all bullion, silver or gold, taken from said mines during said times, shall be divided between the parties of the first and second part in the proportion of fifteen one-hundredths ($\frac{15}{100}$) to the party of the first part, and eighty-five one-hundredths to the party of the second part, but, in case the said party of the second part shall elect to purchase said property as hereinafter provided, the moneys or bullion so given to the party of the first part shall operate as a credit and part payment of the purchase price for said mines and other property.

"Sixth—At any time prior to the first day of December, the said party of the second part may elect to purchase all the property, real, personal and mixed, of the party of the first part at and for the sum of five hundred thousand dollars ($500,000), payable as hereinafter mentioned.

"Seventh—On the payment to the party of the first part through the National Park Bank of New York of said sum of five hundred thousand dollars ($500,000) it is understood and agreed that the said party of the first part shall and will, at its own cost and expense, make good and sufficient conveyances to the party of the second part granting to him good and sufficient title to all of said property free and clear of all encumbrances.

"Eighth—In case the said party of the second part shall exercise his option by determining not to buy said property, all works of a permanent character and fixtures on said property placed thereon by the party of the second part shall belong to the party of the first part with all property of the party of the first part herein mentioned.

"Ninth—The party of the first part shall forthwith, in due form of law, make and execute good and sufficient conveyances and assignments of all said property to the party of the second part, and deposit the same in the National Park Bank of New York, to be by it held in escrow to be delivered to the party of the second part on the payment of said purchase money, as hereinafter mentioned.

"Tenth—The said party of the second part at any time prior to the 31st day of December, 1895, may elect to pay such purchase money to said bank, to be by it credited to the party of the first part on receipt of said conveyances and assignments; or the said party of the second part may, if he so elects, pay four hundred thousand dollars ($400,000) of said consideration money in his bond for that amount or in the bond of any corporation which may acquire said property, said bond to be secured by a first mortgage on said property.     *     *     *

"Eleventh—The party of the second part shall, at his own cost and expense, do the assessment work on the unpatented mines belonging to the party of the first part during the years 1894 and 1895, and shall also pay all taxes and assessments that may be levied or assessed on said property payable during said years of 1894 and 1895; and shall maintain machinery and other improvements on said property in a reasonable state of repair.

"Twelfth—It is understood and agreed that the party of the second part shall explore and develop said property with a view of determining to his own satisfaction the value thereof, and that the work which shall be done on the mines shall be under the most improved mining methods and properly timbered.

"Thirteenth—The work of development herein provided

to be made shall be commenced not later than the first day of October, 1894, and shall be continued without interruption, unless the said party of the second part shall sooner avail of his right to purchase the mines.

"Fourteenth—The said party of the second part hereby accepts the foregoing propositions and covenants, promises and agrees that he will and that his heirs, executors, administrators and assigns shall faithfully keep and perform all and singular the provisions thereof.

"Fifteenth—It is further understood and agreed by and between the parties hereto, in case any litigation should occur during the time the party of the second part is entitled to possession of said property under this agreement touching the title to or possession of said property, the party of the first part shall, at his own expense, conduct such litigation on the part of the said party of the second part, the party of the second part to keep the party of the first part fully advised of any such litigation.

"In witness whereof, the party of the first part has caused its corporate seal to be hereunto affixed, attested by the signatures of its president and secretary, and the party of the second part has hereunto set his hand and seal the day and year first above written."

On September 19, 1894, Canda wrote to Wright as follows: "Dear Sir: Your letter of 7th instant came duly to hand.   I also received a letter from Mr. Hanchett, dated 8th instant.   Mr. Blair having accepted Mr. Hanchett's terms, I send you enclosed the agreement with him, dated 7th inst., which has been duly executed by the Silver Peak Mines.   I also send you a letter to Mr. Wasson, directing him to allow Mr. Hanchett to make the necessary explorations, etc., at Silver Peak.   You will please deliver this agreement to Mr. Hanchett (we retain an original copy executed by him); but before doing so you will please mail to us the two sets of contracts which the company executed and which were sent you.   I would also ask you to return to me the letter to Mr. Wasson, dated August 22d.   It seems that in turning over the contract to Mr. Hanchett we should take up these original papers

which were sent to you. I would say that in accepting Mr. Hanchett's change of the contract I think we have gone a great way. Indeed, I would say that we would not have accepted this excepting that we have confidence in the parties interested with him, and that we believe that the money to develop the property thoroughly will be provided. As I have told you, we have great confidence in the mines, and I think if they are properly worked you will see that they are worth much more than we have asked for them. Of course, we do not expect any one to take them until they have demonstrated that fact to their satisfaction. I trust that the work of development will now be pushed; if this cannot be done, I hope that the contract will be surrendered, so that we may have an opportunity to deal with others."

On the same date Canda wrote to Hanchett as follows: "Dear Sir: I duly received your letter of the 8th inst., and as I telegraphed you on the 15th, we have accepted your terms. I sent Mr. Wright one of the original executed contracts today, retaining the other. I send this to Mr. Wright with a letter to Mr. Wasson, asking him to return to me, before he delivers these to you, the original papers which have been signed by the company, and which he holds. It does not seem right that contracts executed by the company should be in two hands at the same time. I should be very glad to hear from you from time to time as you progress with your work and of course I wish you every success. As I have told Mr. Wright, I think we have gone a great way in accepting your terms; but we have confidence in you and your associates, and we are, therefore, giving you full swing."

On September 26, 1894, Wright wrote to Canda as follows: "My Dear Sir: I have your favor of the 19th instant, enclosing contract in favor of Mr. Hanchett, duly signed by Mr. Blair; the same I have forwarded to Mr. H., who is at present at Silver Peak. Your letter to Mr. Wasson I have also forwarded to him, together with the contract. I enclose you herewith your letter to Mr. Wasson, dated August 22d; also one set of contracts signed by

your company and dated June 14th. The other set Mr. Hanchett has, and I have written him to return them to me. Upon receipt of same I will forward to you."

On December 12, 1894, Gamble wrote to Canda as follows: "My Dear Sir: Would you please tell me what you think of the situation at Silver Peak? Do you think Mr. Hanchett can raise the money? No one here believes that he can. I was very much surprised when Mr. Wright asked you to transfer the contract to Mr. Hanchett, as he (Wright) refused to put up any money because Mr. Hanchett wanted to superintend the property, and Wright knew, as well as every one does, and said that Mr. Hanchett is a failure and always has been. I am also surprised because Mr. Wright knew that I could put up the money, and he had agreed to transfer the contract to Mr. M. F. Tarpey, who had agreed to help me raise the funds. Mr. Wright asked me for ten days in which to communicate with you; he then asked you to transfer the contract to Mr. Hanchett. After you had given the contract to Mr. Hanchett, Mr. Wright told me that he was satisfied that Mr. Hanchett could not raise the money, and that Mr. Crocker would not advance it. Of course I can hold Mr. Wright and Hanchett by law to give me the interest agreed upon. But I do want some assurance that they can comply with the contract. I have spent my money and time and I do not want to lose it. I can put up the money, therefore I want these gentlemen to define just what they are going to do. I had a long talk with Mr. Tarpey today and we decided that I should write you and state the facts. Mr. Tarpey will take the contract with the purpose of fulfilling its requirements, and with me organize a good company, and would have done so at the time the contract was given to Hanchett. Wright had agreed to transfer the contract to Tarpey, but Tarpey, suspecting that Wright was as insincere in this as in all previous agreements, sent a party to interview him on the subject, and learned that Wright had no intention of transferring one fraction of the contract to him or any one else, who would not

recognize him (Wright) as the controlling power, and Tarpey positively refused to allow Wright such an interest as would allow any more of his 'faking.' The entire facts are as follows: Mr. Wright and Chadbourne made an agreement with me to carry me one-third interest of the amount they would hold, and they were to furnish the money for all expenses. I was careful to state to them that they must be able to furnish some of the money themselves, and they said that they could do so; besides, they showed me a contract signed by the following gents: Col. Frank McLaughlin, A. N. Towne, Geo. Gould, J. E. Doolittle, J. B. Wright and F. S. Chadbourne. This contract was entered into by the above-named parties for the purpose of purchasing a mine. On these representations I took them in. After I returned from New York they made no effort to do anything outside of incorporating. Then they concluded to send Mr. Hanchett back to see you and have the contract modified. As soon as I heard that Mr. Hanchett was going to New York to see you, I went to Sacramento to stop him, and I offered to pay all the expenses rather than have him connected with the scheme. Mr. Wright knew why I objected, and assured me that Mr. Hanchett would have nothing whatever to do with the concern. On that representation I allowed him to go; besides he had gone one day ahead of time. Mr. Wright claimed that Mr. Hanchett had some business of his own in New York and would attend to this for me. I was not to pay any of the expenses under my contract, but for fear something might happen, I paid one-third of the expense. When Mr. Hanchett returned, he claimed an interest in the contract. Wright and Chadbourne made no effort to organize their men, but sent Hanchett to see Senator John P. Jones. He couldn't do anything with the senator. Then I took the matter up and had Senator Jones examine the property. He returned to Washington before the examination was completed. The expert made a favorable report, but said that the the terms of the contract were too drastic, but if a more favorable contract could be obtained, he would take hold

of the property,   Hanchett was in New York attending
his daughter's wedding and Mr. Wright asked him to go
to Washington and see what the senator would do.   He
went, but failed to do anything.   Hanchett then returned
here with the contract modified somewhat.   It did not
suit Wright and he returned it to you.   That consumed
some time.   The contract returned here the second
time on the 2d of August.   Now while the contract
was in transit, I proposed to Mr. Wright that we raise
the money amongst ourselves.   He agreed to pay into
the treasury the $5,000, and I was to raise as much
as I could and he was to do the same thing.   I raised
$15,000 and D. A. Bender (Mills's man) offered $10,000
more, making $30,000, the required amount.   When the
day arrived for the paying in of the money, imagine my
surprise when Mr. Wright said he would not put up a
cent, and said any man can buy a mine, but it takes a
smart one to get it for nothing.   You will understand
that this is but a sample of his proceedings.   Then Mr.
Wright assigned the contract to Mr. Hanchett—why, I
do not know.   I then asked Mr. Wright to give me a con-
tract for my one-third, and he told me to go to Hanchett.
I did and he gave me the assigned contract and I took it
to my lawyers and they said, as soon as they looked at
the assignment, that Mr. Wright was held to the Silver
Peak Co. and had accepted the terms of the contract.
Hanchett went out to the mine three months ago, but has
done nothing, and to the best of my knowledge did not
intend to do anything more but sit on his contract.   I
I wrote to him, but received no reply, and at this writing
Hanchett claims the contract is out at Silver Peak and
cannot raise the money; no one will enter into the scheme
with him, for he is said to be visionary, headstrong and
invariably unsuccessful.   While, on the other hand, I am
ready, as I have always been, to fulfil a favorable con-
tract.   When I visited you in New York to secure the
contract on Silver Peak, I did so with the full purpose of
carrying out the lines of a proper contract, which you
must admit I did not obtain at the time.   As I was unable

to make you understand the condition of the property, I accepted the contract you offered, with the determination to put it through, if possible; and if not, to rely upon your granting a contract which would meet the conditions of the property, after I had proven my sincerity and ability. I have used every means in my power to compel Wright and Chadbourne to comply with the terms of the contract, even requesting them to restore the contract to me, which they would not do. I have written you, thinking you understood me, my intentions and purposes, but found that you were granting them powers which you refused to grant me. I could have carried out the contract now granted upon your property had I obtained it. You even went so far as to reply very sarcastically to my last letter, and copied my letter and sent it to Wright. Through a mishap of the postal service the letter miscarried and was returned to me. Therefore, I feel as though you did not, or preferred not to listen to my petitions, but deliberately granted them favors. For your assistance they have imposed upon you, as they did me, and it appears they had no other intention from the start. I desire you to understand that as soon as you granted Wright the contract I lost my power and was obliged to see them abuse your confidence. Even with these conditions, the reports which you received from time to time from Wright were reports as the result of my labors. I may even say that every report you ever received was indirectly from my work. Mr. Wright being in New York at this time, I would like you to read this letter to him, and he dare not deny the facts as stated, which can be verified by M. F. Tarpey and many others. Summing up the situation from my standpoint, these men are trying to do business on the reputation of their relations, and are not meeting with success, and to remedy this matter I desire your support. Yours very truly. P. S.—Just learned that Hanchett is in New York City. Make him put up or give up the contract. We will put up the money. B. A. G."

On December 18, 1894, Canda wrote to Wright as fol-

lows: "Dear Sir: I have received a letter from Mr. B. A. Gamble of San Francisco, a copy of which and of my reply thereto I send you herewith. These speak for themselves. I regretted exceedingly when I learned that you had been here that I did not have the pleasure of meeting you. I should indeed have been very glad to have done so, as would also my brother F. E."

On December 30, 1894, Gamble wrote to Canda as follows: "My Dear Sir: Your letter of the 18th instant has been received. I wrote you setting forth the facts in this matter, because Mr. Hanchett is trying to deal unfairly with me, and I knew that all you would have to do without impairing your own interest would be to tell both Wright and Hanchett to live up to their agreement with me. Wright knows very well that Hanchett is working sharp practice, and he agreed to call on you and straighten this matter up, but he could not make any plausible excuse, therefore he did not go near you, I was pressing Wright to raise the money and I offered half or all the money, and Wright knew that I could do it, and he agreed to give up his part of the contract, though he did not appear to be satisfied. Now, then, they had to either put up or quit and their only alternative was to have the contract transferred. They were still afraid of me, and even after the contract was transferred to Hanchett he came here and told me that my interest was all right. I was dissatisfied to have Hanchett manage the mine, for the reasons I have already told you. No one here would have anything to do with the scheme if Hanchett was to to superintend the mine. Wright and Chadbourne both refused on that account to put up any money. I knew nothing about the transfer until after it was made and I received Wright's dispatch to meet Hanchett. You say I did not post you. I believed that these people would go ahead and comply with the terms of the contract; besides I was assured that Hanchett would have nothing to do with the management, therefore I had nothing to write about. It appears from your letters that you did not understand that I owned any interest in the contract

after it was given to Wright. I now tell you that I did. It was I who had Senator Jones examine your property and at my own expense. The expert made a favorable report on the property and it made your property valuable. When I wrote you about the examination your reply surprised me. I now believe that some one has been booming themselves. I do not think that Mr. Crocker will advance any money to Mr. Hanchett. If he does he will not give him more than $10,000 or $15,000 now. What will that do and where will he get the $100,000 next October? Of course you did what you thought was right in transferring the contract to Mr. Hanchett, as Mr. Wright asked you to do so, and Mr. Hanchett being Mr. Crocker's father-in-law you supposed that Mr. Hanchett could get all the money he wanted; besides, Hanchett told you that he could get the money from Mr. Crocker. If a failure is made now it will kill Silver Peak forever. If you conclude that Mr. Hanchett cannot go on and you will give me the chance I will have one of the richest firms on this coast make an application for the contract. All you have to do is to listen to the application. The examination has already been made and they are ready to go right ahead. Besides, they will agree to spend a certain sum on the property and can make payments when they are due. They are waiting for your reply."

On January 8, 1895, Canda wrote to Gamble as follows: "Dear Sir: I have received your favor of the 30th ult. As I wrote you in my last letter I do not see why you address me on the subject. If you have agreements with Messrs. Wright and Hanchett, you can doubtless enforce them, but I do not see how, having the opinion of Mr. Hanchett which you express to me, you can desire to have any business relations with him. I certainly should not want any if I entertained a like opinion of him. As I told you before, I was ready to go on with you in any reasonable way, but you permitted the contract to expire; indeed you did not answer my letters so it left us no alternative but to do the best we could,

desiring to sell the property.   Mr. Wright also permitted his contract to expire and after some weeks we entered into an agreement with Mr. Hanchett.   The contract stands with him and we are entirely satisfied, and even if we were not we would not now be in a position to enter into contract with any one else."

On January 8, 1895, Canda wrote to Wright as follows: "Dear Sir: I send you enclosed copy of a letter received from Mr. Gamble, dated December 30, and of my reply to him of today.   I send this in sequence of my previous letter on the same subject sent you on the 18th ult."

On January 10 or 11, 1895, Gamble wrote to Canda as follows: "Hon. C. J. Canda: I have learned since I last wrote you that reports have been made to you that I could not raise the capital to work Silver Peak.   To prove the untruthfulness of the statement, I now send you the name of the party I wrote you of in my last letter, C. H. King, No. 1029 6th Ave., Oakland, Cal.   Mr. King is a millionaire, and he has several gentlemen associated with him who are as equally responsible.   Mr. King has made an examination of your property, and they are anxious and willing to make you a proposition, and they will agree to erect a new mill at the mine and put in an electric plant, also to prospect the property in good shape.   Mr. King is now framing a proposition which I will send you in a few days.   You can easily ascertain who Mr. King is by referring to any bank in Oakland, Cal., or consulting Bradstreet.   Mr. King says it will cost $75,000 or $100,000 to do this work, and that he is willing to risk this amount. I was in Oakland last night and he told me that he positively would not have anything to do with Mr. Hanchett. I will say, however, that if you are satisfied that Mr. Hanchett can go on and fulfil the contract, I do not see why I should be left out, and I ask you to help me.   These men were my partners, and I do not see how they can make a contract on the side, without telling me, and then declare me out.   My lawyers say that I can hold Mr. Wright and Hanchett to the original agreement, but I do not want a lawsuit if it can be avoided, and this can be

avoided by telling them to do as they agreed to do by and with me. If you will do that Mr. Hanchett will lose no time in signing over my interest, but if you will not do that, H. will not give up without a suit, which I shall commence at once. These people got it on my contract, that is, I took Wright in and he took H. in; otherwise H. could have had no interest, as I would not have had anything to do with him, therefore I do not intend to allow H. to tell me that I am 'out'—I shall tie him right up, and then we shall see who is telling the truth. I am of opinion, however, that H. will make a failure, for I cannot see where H. is going to get the money. I am very sorry that the contract is in the condition it is, because it is very hard to get a set of men who are able to handle that property, as the cost of equipment is so great and there are so many impediments to overcome. Mr. King and associates are willing to equip the property, as I have told you. Now if H. and Wright are so fair and they have no one to back them, I would think they would say, 'We cannot fulfil the contract,' and so return it to you. You will in the course of a few days receive Mr. King's proposition, and then you can move accordingly."

On January 17, 1895, Canda wrote to Gamble as follows: "Dear Sir: Your letter dated January —, 1895, has just been received. I do not see what more I can say to you than I have in my late letters, unless it is to add that it does not seem fair after you had abandoned, apparently, all interest, and had failed to answer my letters, that you should appeal to me now to assist you in a matter over which I have no control. Mr. Hanchett has a contract for the Silver Peak property, and if he lives up to it, as I expect he will, he will get his deed to the same. If he fails, however, to carry out his contract, we will then be looking for a purchaser of the property."

On February 7, 1895, Hanchett wrote to Canda as follows: "Dear Sir: The other part of this letter was dictated by Mr. George Crocker and his associates. I write this to ask you to comply with their demands, as it seems the only way I can accomplish the object. * * * There

has been every obstacle thrown in my way that was possible. Gamble served them with a letter threatening suit against Wright and others, and Garrard, the man that claims the millsite and tailings, has notified them that he is the owner, so you see I have considerable to contend with. Now if you people will make this extension of time I am sure I can go on and have the thirty-stamp mill going by June, and the others as soon after as possible. * * *"

On February 13, 1895, Canda wrote to Hanchett as follows: "My Dear Sir: * * * On conferring with my associates, the Messrs. Blair, I find they are unwilling to grant any further extension of time. * * * As to Mr. Gamble, there can be nothing in his preposterous claim. Certainly, if you will offer him an interest in the mine and require him to pay his proportionate share of the expenses, I think there is no doubt that he would fail to do so, and how could he then have any claim? And if he did pay, I do not see that you could object to have the aid which he would thus render. * * * I am not prepared to say, however, that when December comes, if you have complied with the terms of the agreement, the Messrs. Blair would not be willing to give you a reasonable extension of time and that that would be on a business basis, of course."

As a result of a number of letters and telegrams passing between Hanchett and Canda, an agreement was entered into of date November 21, 1895, between the Silver Peak Mines and Hanchett extending the Hanchett option of September 7, 1894, to August 12, 1896.

On October 7, 1895, Canda wrote to M. F. Tarpey, a letter containing the following reference to Gamble: "My Dear Mr. Tarpey: With reference to Mr. Gamble, I have to say: Mr. Wright and all the other gentlemen whose names he gave me as being interested in his proposed Silver Peak scheme without exception have dropped out. Mr. Wright, who had taken the bond, wrote me about three months after it had expired that he was unable to go on with the business, and he recommended

that I take it up with Mr. Hanchett, his father-in-law.
Mr. Hanchett came on here and I had several confer-
ences with him.   I found that he had no capital, but he
was able, as I understand, to borrow some from his son-
in-law, Mr. George Crocker, who, however, declined to
take any interest in the venture.   Mr. Hanchett undertook
to develop the mines, as he informed me, on his sole and
individual account.   Owing to the backing which he
seemed to have, we entered into an agreement with him,
which expires on the 1st of January.   From the late cor-
respondence with him I am led to think that that time
may be extended, as he does not seem to have progressed
in the work of development as rapidly as was expected.
I do not see, under the circumstances, what claims Mr.
Gamble can have on Mr. Hanchett, particularly as before
entering into the arrangements with Mr. Hanchett I
notified Mr. Gamble that his friends were not going on
with the business.   You can understand that I do not
like Mr. Gamble's attitude in this matter, as it seems
that he would be ready to prevent our consummating a
sale of the property, which we are anxious to do."

At or about the time (September, 1894) that Wright
notified Canda that "he would not be able to attend to
the Silver Peak business" and requested that a bond be
given in the name of Hanchett, the following agreement
was signed by Hanchett and given to Wright:

"Whereas, J. B. Wright, on the 23d day of June, 1894,
entered into a certain contract with the Silver Peak
Mines, a corporation existing under the laws of the
State of New York, concerning mining property situate
in Esmeralda County, State of Nevada, which contract is
hereby referred to and made a part hereof, and which
contract was this day assigned to me by said Wright.

"Now know all men by these presents that I hold the
said contract under said assignment thereof to me, upon
the following agreements:

"1. Four-fifths thereof to my own use and the other
one-fifth to and for the use of the said J. B. Wright as
his trustee.

"2. The undersigned, at his own expense, is to do and perform all and singular the acts and things which in said contract the said Wright contracted to do.

"3. If the undersigned shall elect to take said property in said contract mentioned, as provided therein, the net proceeds of said mines in his hands shall be appropriated towards the payment of said $100,000, and the balance shall be paid one-fifth by said Wright and four-fifths by the undersigned. But in no case shall the said Wright be required to pay money out of his private funds, but his interests in the said business shall alone be liable.

"4. It is contemplated that a corporation shall be formed to operate the mines mentioned in said contract and in that case shall own four-fifths of the stock and the said Wright one-fifth.

"Witness my hand the day and year first above written.    L. J. Hanchett."

On January 2, 1896, Hanchett wrote to Canda a letter which is of interest or importance only in that it shows that differences had arisen between Hanchett and the Silver Peak Company, over the execution of the option which subsequently culminated in litigation.

SUITS BETWEEN HANCHETT AND SILVER PEAK MINES

In August, 1896, the Silver Peak Mines declined to further extend its contract of September 7, 1894, with Hanchett and, upon his refusing to account for the ore mined by him or to surrender its properties, brought suit against him on April 6, 1897, in the United States Circuit Court for the Southern District of New York, obtaining due personal service on the defendant. On or about April 17, 1897, the Silver Peak Mines also began an action at law against Hanchett in the United States Circuit Court for the Ninth Circuit, District of Nevada, and in aid thereof filed a bill in equity asking for an injunction, which was granted.

In both the aforesaid actions at law the facts alleged by the Silver Peak Mines were substantially the same and the relief asked for was: (a) For the payment of royalties due under his contract.    (b) For damages for injuries

done to plaintiff's mines by improper mining methods employed by the defendant. (c) For a finding that plaintiff's contract with Hanchett was terminated.

In the Nevada action at law the restitution and possession of the properties was also asked for as against Hanchett and any one claiming by, through, or under him.

Hanchett appeared in and defended all the aforesaid actions, denying plaintiff's allegations and interposing counterclaims in which he set out: (a) That his contract had never expired. (b) That he had been prevented by plaintiff's wrongdoing from fulfilling it. (c) That he was still entitled to purchase the property, and to offset against the agreed purchase price the amount of the damages which he alleged he had sustained at the hands of the Silver Peak Mines. (d) That he was ready and willing to perform.

The New York action was the first to be reached and came to trial before Judge Shipman and a jury on the 12th day of January, 1899. Plaintiff secured a verdict and obtained judgment against Hanchett for some $21,000 damages for royalties. The plaintiff, Silver Peak Mines, thereupon moved in the action pending in Nevada for permission to amend its complaint by pleading the aforesaid judgment obtained in New York. This motion was opposed by Hanchett's attorneys. The court, however, by Hawley, J., permitted the amendment asked for by plaintiff on the ground that all issues raised in the Nevada action had been adjudicated in the New York action. As a result of this amendment to the complaint, judgment was finally entered against Hanchett in the Nevada actions in September, 1901, declaring the termination of his contract, ordering the restitution of the properties to the Silver Peak Mines, and awarding the latter damages in the sum of about $21,000. Meanwhile, Hanchett had abandoned possession of the properties to the Silver Peak Mines.

BLAIR FORECLOSURE

After the commencement of the Hanchett litigations, above set forth, John I. Blair filed a bill to foreclose the

mortgage given him by the Silver Peak Mines in 1879, in the United States Circuit Court, District of Nevada, in July, 1897. In this foreclosure suit John I. Blair was sole plaintiff, and the Silver Peak Mines as mortgagor and owner, and L. J. Hanchett as claiming some interest in the premises were named as defendant. The defendant the Silver Peak Mines duly appeared, admitted the mortgage and the amount of its indebtedness, secured thereby and consented to the entry of decree of foreclosure. Hanchett appeared and after demurring unsuccessfully to the bill (*Blair* v. *Silver Peak Mines,* 84 Fed. 737) answered and set up among other defenses: (1) That the Silver Peak Mines and John I. Blair, through the latter's alleged ownership or control of all the stock of the former, were in reality one and the same; (2) that there was no valid consideration for the mortgage; (3) that Blair's right to enforce the mortgage was barred by the statute of limitations; (4) that Blair's foreclosure action had been begun for the purpose of preventing Hanchett from performing under his option; (5) that Blair was estopped by his representations from enforcing his mortgage as against Hanchett, and (6) that Hanchett had exercised his option to purchase under his contract.

Full testimony was taken on all these issues by the plaintiff whose witnesses were cross-examined at great length on behalf of defendant Hanchett, who thereafter being in default, a final decree was entered on the 29th day of November, 1898. By this decree in foreclosure, the mortgage was declared to be a valid and subsisting first lien in favor of John I. Blair on all the properties described therein. Hanchett's attorneys then moved for a rehearing, which was denied by Judge Hawley. (*Blair* v. *Hanchett,* 93 Fed. 332.)

Hanchett appealed to the United States Circuit Court of Appeals, which by a unanimous opinion, held: (1) That the mortgage of 1879 was valid in its inception and based upon a good consideration; (2) that its foreclosure was not barred by the statute of limitations; (3) that Hanchett had no such interest in the property described in

the contract of option as gave him the right to plead the statute of limitations; (4) that John I. Blair was entitled to foreclose his mortgage even had he owned all the stock of the Silver Peak Mines and had he organized the corporation for the purpose of handling and managing the properties he transferred to it; (5) that any rights which Hanchett, or those claiming by or under him, might have under his contract with the Silver Peak Mines was subordinate to the lien of Blair's mortgage, or, to use the words of the court, "it is clear that, whatever interest or claim Hanchett may have on or to the property of the Silver Peak Mines, it is subsequent and subject to the lien of complainant's mortgage." (*Hanchett* v. *Blair*, 100 Fed. 817.)

The premises in question were thereafter sold by special master under the foreclosure decree, and bought in at public auction by John I. Blair on the 25th day of May, 1899.

#### BLAIR JUDGMENTS AT LAW AGAINST SILVER PEAK MINES

Subsequent to the date of the mortgage given him by the Silver Peak Mines in 1879, John I. Blair at various times advanced moneys to said company to enable it to maintain and develop its mining properties. In 1898 the moneys so advanced by Blair amounted to some $68,000, for recovery of which he brought suit against the Silver Peak Mines in the United States Circuit Court for the Southern District of New York in February, 1898, and recovered judgment for some $68,162 or thereabouts. Said judgment was certified to the United States Circuit Court for the District of Nevada, and a suit brought thereon in said court, which resulted in a judgment for the plaintiff in the sum of about $68,162. For the purpose of satisfying this judgment a writ of execution was duly issued by the United States Circuit Court on or about the 12th day of April, 1898, directing the sale of certain lands and properties belonging to the defendant, the Silver Peak Mines. In pursuance of said execution said properties were levied upon and sold by the United

States marshal at public auction on the 25th day of May, 1899, and bought in by John I. Blair.

After the aforesaid sales by the special master under the foreclosure and by the sheriff under execution, but before the delivery of deeds by them, John I. Blair died on December 2, 1899, leaving a will which was duly probated in the orphans' court, in the County of Warren, New Jersey, in December, 1899, and an exemplified copy thereof filed in the district court for Esmeralda County, Nevada. Letters of administration with the will annexed were thereafter taken out in Esmeralda County by D. C. Blair. On application of DeWitt C. Blair, as sole residuary legatee under John I. Blair's will, and as the sole executor named therein, but before letters of administration had been granted to Blair in Nevada, Hawley, J., directed the special master and sheriff to execute their deeds direct to DeWitt C. Blair. Said deeds were executed and delivered in April, 1900, and duly recorded. Thereafter the Silver Peak Gold Mining Company was incorporated under the laws of New Jersey on July 24, 1900, with a capital of one hundred thousand dollars, all of which was issued. This corporation purchased from DeWitt C. Blair the properties conveyed to him by the special master and sheriff as aforesaid, paying for such properties in part by the delivery to Blair of a purchase money mortgage for $500,000, dated the 9th day of October, 1900, which was duly recorded in the office of the clerk of Esmeralda County on the 18th day of October, 1900.

PENDING ACTION

On March 2, 1896, this action had its beginning by the the filing of a complaint in the district court in and for Esmeralda County in a suit in which B. A. Gamble was plaintiff and L. J. Hanchett, John B. Wright, F. S. Chadbourne, George Crocker and the Silver Peak Mines were defendants. The purpose of the action was as stated in *lis pendens* filed with the county recorder of Esmeralda County on March 5, 1896, to obtain the decree of the court:

"Determining that the plaintiff is a partner with the said L. J. Hanchett and the said F. S. Chadbourne in that he owns and is entitled to the possession of a one-third interest in the said contract, marked 'Exhibit C,' or in any other contract made with the Silver Peak Mines, * * * and that the said plaintiff is entitled with the said defendants, and each and any of them holding the said contract marked 'Exhibit C,' or any extensions or renewals thereof, upon the fulfillment of the terms of agreement with the said Silver Peak Mines, to a conveyance of the property mentioned in said Exhibit C, or in any extension or renewals thereof, and is entitled to a one-third interest of the proceeds, profits and property arising out of the said contract, or any and all renewals thereof." No other *lis pendens* was ever filed.

In the complaint no claim was made against the Silver Peak Mines, nor any relief prayed for against it or its properties. No reference was made to John I. Blair or his mortgage, nor was there any allegation that the Silver Peak Mines ever knew of the alleged agreement of partnership between Gamble, Chadbourne and Hanchett.

On September 20, 1897, Gamble filed certain amendments to his complaint in and by which the name, "John I. Blair," was substituted for the "Silver Peak Mines" in various paragraphs of the complaint, but without making John I. Blair a party defendant, or asking any relief against him, or without altering the character of the action set out in the original complaint. No new summons was issued, nor any reference made to the mortgage held by John I. Blair then in process of foreclosure.

Nearly two years later, on July 16, 1899, Gamble filed what is denominated a "second amended complaint." In this "second amended complaint," the allegations of partnership are modified and in lieu of an allegation of the existence of a partnership between Gamble, Chadbourne and Hanchett is an allegation of a similar partnership relation existing between Gamble, Chadbourne and Wright, and that Hanchett was merely the agent of such partnership in securing the option of June 23, 1894. Chadbourne,

who was named as defendant in the original complaint, now for the first time appears as a plaintiff in the suit and John I. Blair is for the first time named as a defendant, while the name of George Crocker is dropped as a defendant. No attempt appears to have been made to obtain service upon John I. Blair, who was never served with process and never appeared in the action.

The relief prayed for in this second amended complaint was as follows: "That it be adjudged and decreed that said L. J. Hanchett, at all times mentioned in said complaint up to September 7, 1894, was the agent and trustee of said plaintiffs and the defendant John B. Wright; that said L. J. Hanchett obtained said contract (Exhibit E) to the extent of an undivided two-thirds interest therein as the agent and trustee of plaintiffs in equal shares and the remaining one-third interest in said contract for the benefit of himself and of Wright.   *   *   * That said Hanchett was not a partner with said complainant in said contract (Exhibit E), but acquired said one-third interest therein for himself and the defendant Wright, and that at all time held possession under said contract without their consent and against their will." *   *   *   (2) "John I. Blair be required to set forth any claim which he asserts in and to said mining claims and properties above described, and that it be determined by the court that any and all of said rights and claims of said defendant John I. Blair are subject and subordinate to the said rights of plaintiffs, and are wholly invalid."

More than four years after the filing of this second amended complaint the action was removed from the First Judicial District Court in and for Esmeralda County to the Second Judicial District Court in and for Washoe County on the ground of the disqualification of the judge of the former district. (See *Gamble* v. *District Court,* 27 Nev. 233.)

About a year later, on October 12, 1904, plaintiffs Gamble and Chadbourne filed what is denominated the "third amended and supplemental complaint," in which Laura Clark Wright, Ernest Wright and Annie Beatrice

Wright are impleaded as defendants as the heirs of the defendant J. B. Wright, deceased.   DeWitt Clinton Blair in his own right, and as administrator with the will annexed of the estate of John I. Blair, deceased, is named as a party defendant in the place of the said John I. Blair, and the Silver Peak Gold Mining Company, the present owner of the property, is named as a defendant.

The defendants, other than the Wrights and Hanchett, being citizens of different states from that of the plaintiffs, caused the action to be removed from the state court to the United States Circuit Court for the District of Nevada.   A motion made by the plaintiffs to remand was denied by Hawley, J., in April, 1905.   Subsequently, and following the decision of the United States Supreme Court in the case of *Ex Parte Wisner*, 203 U. S. 449, and the interpretation thereof by the United States Circuit Court of Appeals for the Ninth Circuit, plaintiffs renewed their motion to remand, which was granted by Farrington, J.

The defendants, DeWitt Clinton Blair, Silver Peak Mines and the Silver Peak Gold Mining Company, thereupon filed their separate answers to the plaintiff's "third amended and supplemental complaint."   In these several answers, in addition to denials of material allegations in the complaint, and other defenses, the said defendants pleaded the several judgments in the various actions in the federal courts above referred to as a bar to any rights of the plaintiffs to recover.

The action came on for trial in May, 1908.   All of the evidence offered upon either side was either documentary or in the form of depositions, no oral testimony being heard by the court.

On the 6th day of February, 1909, the following judg-ment was entered:

"This cause was tried by the court without a jury, commencing on the 11th day of May, 1908, and ending on the 15th day of May, 1908, J. W. Dorsey, Esq., George W. Baker, Esq., and R. M. F. Soto, Esq., appearing as counsel for the plaintiffs, Rush Taggart, Esq., Clarence B. Mitchell,

Esq., M. A. Murphy, Esq., and Samuel Platt, Esq., appearing as counsel for the defendants, DeWitt Clinton Blair, in his own right, and as administrator, with the will annexed, of the estate of John I. Blair, deceased, Silver Peak Mines, a foreign corporation, and Silver Peak Gold Mining Company, a foreign corporation. At the conclusion of the taking of the evidence herein on the 15th day of May, 1908, on motion of counsel for the plaintiffs, the default of each of the defendants L. J. Hanchett, Laura Clark Wright, Ernest Wright and Annie Beatrice Wright, for their utter failure either to demur or answer the third amended complaint and the supplemental complaint here, each having appeared thereto by attorney, was duly and regularly entered herein.

"After due consideration of the evidence herein and the arguments and briefs of counsel for the respective parties made and filed herein, complete findings of fact and conclusions of law, thereby directing judgment to be entered herein, in accordance therewith, in favor of the plaintiffs B. A. Gamble and F. S. Chadbourne, and of the defendants Laura Clark Wright, Ernest Wright and Annie Beatrice Wright, and against the defendants L. J. Hanchett, DeWitt Clinton Blair, in his own right, and as administrator, with the will annexed, of the estate of John I. Blair, deceased, Silver Peak Mines, a foreign corporation, and Silver Peak Gold Mining Company, a foreign corporation.

"Wherefore, by reason of the law and the premises, the above-named court orders, adjudges and decrees as follows:

"First—That the option contract or agreement marked 'Exhibit D,' annexed to the third amended complaint and supplemental complaint herein, with the extension thereof November 12, 1895, are in full force and effect, and that the plaintiffs B. A. Gamble and F. S. Chadbourne, and the defendants Laura Clark Wright, Ernest Wright and Annie Beatrice Wright, as the successor in interest of John B. Wright, deceased, are entitled to have said Exhibit D with its said extension enforced; and that

the interests of said plaintiffs in and to and under said Exhibit D, and its said extension, and in and to the mining properties therein, and in said complaint described, are ten undivided fifteenths, and the rights of the defendants, the said Wrights, as tenants in common and as successors in interest of John B. Wright, deceased, in and to and under said Exhibit D and its said extension, and in and to said mining properties, are one undivided fifteenth. That the said Exhibit D is in the words and figures following, to wit: * * * (Hanchett contract of September 17, 1894.)

"Second—That in and by the aforesaid extension of November 12, 1895, the time for the performance by the defendant L. J. Hanchett of the said option contract, Exhibit D, was extended to the 12th day of August, 1896.

"Third—That the time for the enforcement of said Exhibit D, with its said extension, and for the performance thereof by the plaintiffs and the said Wrights, defendants, the parties interested therein, shall begin to run as to them upon the expiration of one hundred and twenty (120) days after notice to the successors in interest of Silver Peak Mines and of said L. J. Hanchett, by the plaintiffs and said Wrights, defendants, or any one or more of them, that they, said plaintiffs and said Wrights, or any one or more of them, are or is desirous of entering upon the performance of said Exhibit D and its said extensions, such notice to be given within ninety (90) days after the entry of this judgment herein.

"Fourth—That neither the defendant DeWitt Clinton Blair, in his own right, nor the defendant Silver Peak Gold Mining Company, has any right, title, interest or estate in or to the mining properties described in the complaint or any part thereof.

"Fifth—That whatever title was acquired in or to said mining properties of John I. Blair in his lifetime under and by virtue of the purchase by him at the foreclosure sale and the execution sale, respectively, mentioned and set forth in the answer of the defendants DeWitt Clinton

Blair, in his own right and as administrator, with the will annexed, of the estate of said John I. Blair, deceased, upon his death became and still is vested in his estate represented by said DeWitt Clinton Blair, as such administrator, subject to the rights of the plaintiffs and the defendants Wrights, under said Exhibit D and its said extension; and that the title to said mining properties now vested in said estate of said John I. Blair, deceased, was acquired by said John I. Blair in his lifetime under and by virtue of the aforesaid foreclosure and execution sales, respectively.

"Sixth—That the defendants and their successors in interest who have acquired any right, title or interest in or to the aforesaid mining properties subsequent to the filing of the notice of the pendency of this action upon the commencement thereof, and set forth in the answers of the defendants filed herein, be and they are hereby required and directed to permit the plaintiffs and the said Wrights, defendants herein, or any one or more of them, upon receiving the notice herein above provided for, to enter upon the performance of said Exhibit D, with its said extension, and for that purpose to permit said plaintiffs and said defendants Wrights, or any one or more of them, to enter upon the said mining properties and into the possession thereof.

"Seventh—That whatever right, title or interest the defendant L. J. Hanchett had in or to or under said Exhibit D, or its said extension, or in or to said mining properties, by virtue of said Exhibit D, or its said extension, became barred and extinguished by reason of the foreclosure sale and the execution sale referred to in the answer of the defendants Silver Peak Gold Mining Company and DeWitt Clinton Blair, individually and as administrator as aforesaid; and that said L. J. Hanchett has no right, title or interest in or to said mining properties, or any part thereof, or in or to or under said Exhibit D or its said extension.

"Eighth—That the plaintiffs herein and the defendants Wrights are entitled to an accounting or damages herein,

at their election, and that evidence for the purpose of obtaining such accounting or determining the damages to which said plaintiffs and said defendants Wrights, as against the other defendants or any of them, or their successors in interest, may be taken before the court or a referee, as the court may determine or direct, upon thirty days' notice of an application to the court for an order fixing the time and place of taking such evidence, and for the appointment of a referee, if the court shall determine that a referee be appointed.

"Done in open court this 6th day of February, 1909."

On the 25th day of May, 1909, upon the motion of plaintiffs, and over the objection of appellants herein, the court ordered the issuance of a writ of assistance and directed that evidence be taken on an accounting to determine the amount of damages to which the plaintiffs might be entitled. On June 17, 1909, the court made an order for the filing of a bond in the sum of $150,000 staying execution until fifteen days after the court's determination of the motion for a new trial then pending.

On the 22d day of January, 1910, the day previous to the last day allowed under the statute for an appeal from the judgment, no decision having been rendered on the motion for a new trial, an appeal from the judgment was taken.

Upon application to the court to fix the amount of a bond to stay the execution of the judgment pending the appeal, and the plaintiffs having asked that such bond be fixed at $1,000,000, the court on January 27, 1910, fixed the 12th day of February following as a date upon which testimony would be heard to determine the amount of such bond, and that in the meantime execution be stayed upon a nominal bond of $300. On the same day, January 27, 1910, a bond was filed providing for $300 for the costs of appeal and for $300, conditioned that during the possession of the premises by the appellants they would not commit waste, and that if the judgment be affirmed they would pay the value of the use and occupation of the premises until the delivery of the possession not

exceeding that amount. No other undertaking upon appeal was filed. Appellants excepted to the order of January 27, 1910, and to other orders subsequently made relative to fixing a time for taking testimony to determine the amount of the stay bond.

Shortly thereafter application was made to this court for a writ of prohibition restraining the lower court from executing the writ of assistance or proceeding to take evidence in an accounting to determine the amount of damages to which the plaintiffs might be entitled. The writ prayed for was denied by this court. (*Silver Peak Mines* v. *Second Judicial District Court,* 33 Nev. 97.)

Immediately thereafter one of the appellants herein, the Silver Peak Gold Mining Company, applied to the United States Circuit Court, Ninth Circuit, District of Nevada, for an injunction against the plaintiffs and the clerk of the Second Judicial District Court of the State of Nevada in and for Washoe County, and the sheriff of Esmeralda County, restraining them from proceeding under the judgment obtained by the plaintiffs in the said district court of this state, upon the theory that the judgment obtained in the state court was in violation of the petitioner's rights, under and by virtue of the said several judgments obtained in the circuit court of the United States against Hanchett and Silver Peak Mines. On the 30th day of December, 1911, the circuit court of the United States by Morrow, J., issued a temporary injunction "staying the issuance of a writ of assistance in the state court until the further order of this court, upon the complainant giving a bond in the sum of $150,000."

The contentions of the respective parties upon this appeal are succinctly stated in appellant's opening brief as follows:

APPELLANTS' CONTENTIONS

"1. That each of the various written options set forth in the evidence constituted a separate, complete and independent contract between the parties named therein and none others.

"2. That previous to an election to purchase by the

optionee named in any of the contracts, such contracts were (a) unilateral, (b) executory, (c) personal to the optionee, and (d) did not vest him with any interest as vendee in the properties described therein.

"3. That the election provided for in such options was a single election to purchase and pay for the whole property as a unit, and was to be exercised by the person designated in the option at one point of time, and in respect to the entire property.

"4. That there is no sufficient evidence of any partnership between Chadbourne, Gamble and Wright, but that if such a partnership existed, the evidence shows that it was never brought to the notice of the Silver Peak Mines or John I. Blair, and that in any event it could only have related to the fruits or avails of any options secured by any one of the alleged partners after an election to purchase by an optionee named in the contract.

"5. That notwithstanding Gamble, Chadbourne and Wright may have had a partnership arrangement between themselves, or, as members of such partnership, may have had an arrangement or contract with Hanchett as their agent, neither such partnership arrangement nor such contract with Hanchett could have the effect of changing the express terms of the written contract between the Silver Peak Mines and Hanchett, nor give to any one of these parties any rights as a contracting party under that contract with the Silver Peak Mines or with John I. Blair, nor could any oral testimony be admitted to contradict the written contract, as to who were the parties to it, and entitled to its benefits and privileges.

"6. That any equity or legal right which Gamble, Chadbourne or Wright may have acquired by virtue of any arrangement or contract between themselves or with Hanchett, was enforceable only as against the parties to such contracts or arrangement, and could not be enforced as against the Silver Peak Mines or John I. Blair by reason of the fact that Gamble, Wright, Chadbourne or Hanchett had a contract with the Silver Peak Mines or

John I. Blair. And any interest plaintiffs may have obtained in the proceeds of the Hanchett contract by virtue of a collateral agreement with Hanchett was taken by them subject to the performance of the contract by Hanchett, the optionee designated therein as the person to perform.

"7. That the title of D. C. Blair and the Silver Peak Gold Mining Company as the successors in interest of John I. Blair to the properties in question is perfect and complete by reason of the sales under the foreclosure decree and money judgments obtained by John I. Blair against the Silver Peak Mines and Hanchett, because: (a) The lien of both mortgage and judgment were superior to plaintiffs' rights, and the *lis pendens* filed by Gamble herein had no effect as against the mortgage of 1879 or the suits instituted in the federal courts by John I. Blair; (b) because John I. Blair could not contract for the Silver Peak Mines Corporation, nor it for him, nor were they one or the same; (c) because Judge Hawley had full authority under the circumstances described to direct the special master and marshal to execute deed directly to DeWitt Clinton Blair, and that, even if such authority were doubtful at the time the deed was ordered by reason of the want of probate proceedings in Nevada, nevertheless, in view of the subsequent appointment by the Nevada courts of D. C. Blair as administrator with the will annexed, the question is of no importance, because such appointment would relate back and validate the preceding action of the federal court.

"8. That plaintiffs are bound by the various federal judgments pleaded by the defendants herein and obtained by John I. Blair and the Silver Peak Mines against Hanchett in reference to the contract of September 7, 1894, through which the plaintiffs claim, because upon plaintiffs' own theory of the case, Hanchett necessarily represented plaintiffs in all respects in said contract, and any judgment or decree which bound Hanchett would of necessity bind plaintiffs, the federal court having acquired full jurisdiction of all the parties named in

the written contracts and of the subject-matter in said suits.

"9. That in no event is the contract of September 7, 1894, between Silver Peak Mines and Hanchett, under which plaintiffs claim, one which can be enforced specifically: (a) Because the duties and obligations of Hanchett, the optionee named therein previous to the exercise of an election to purchase, involved the exercise of personal direction, management and control of a continuing character, and no court of equity will undertake the supervision and direction of a continuing activity of this nature. The same fundamental objections to a decree for specific performance apply to the plaintiffs during the term of the option named in the contract, with the added objection that they were in no sense parties to the contract which they ask to have specifically enforced. (b) Because the contract of September 7, 1894, only gave to Hanchett an election to examine the properties named therein, and upon such examination to further elect whether or not he would purchase them upon certain terms noticed in the contract, but did not require him to make such examination, or subsequent election, and the contract was therefore not mutual. Had plaintiffs been parties to the contract the same objections would have applied to a decree for specific performance in their favor. (c) Because Hanchett is barred by the decree of the federal court, and plaintiffs can only claim through him, but, were it otherwise, plaintiffs' conduct, claims, and representations during the life of the contract, were such as to estop them from demanding a decree for its specific performance. (d) Because the right to a specific performance of the contract terminated as to Hanchett as well as the plaintiffs when the time named in the contract expired without any election to purchase having been exercised, and compliance with the terms of the contract as to payment, etc., upon the election to purchase, yet, were it otherwise, the plaintiffs are estopped from maintaining such suit by their subsequent laches in regard to the institution and prosecution of this suit. (e) Because, since the making of

said contract of September 7, 1894, the status of the parties, and of the properties, the subject-matter of the contract has so changed and altered that to now render a decree for specific performance would be grossly inequitable, and the parties should be left to their remedy at law."

RESPONDENTS' CONTENTIONS

"1. That a partnership existed between Gamble, Wright and Chadbourne for the purpose of acquiring possession of the Silver Peak Mines properties, and that the Silver Peak Mines and John I. Blair had knowledge of the existence of such partnership.

"2. That by virtue of such partnership, each of the partners acquired an undivided fractional interest in the properties covered by any option which might be obtained by any one of them, or by Hanchett.

"3. That the various options secured from Blair or from the Silver Peak Mines were each only extensions and modifications of the original option given to Gamble by John I. Blair in March, 1893, and respectively vested in each partner a real estate interest in an undivided fractional portion of such properties proportionate to his interest in the partnership.

"4. That the fractional interest so claimed by any one of the alleged partners can be enforced by him separately, not only against any copartner named as optionee in the various contracts, but also against the Silver Peak Mines and John I. Blair, and against the properties themselves, and that the election provided for in the option can be exercised by each of the alleged partners and even by the heirs of a deceased partner separately to the extent of his proportionate interest.

"5. That such interest of the various partners was superior to the title of D. C. Blair and the Silver Peak Gold Mining Company derived through the foreclosure of John I. Blair's mortgage, executed, delivered and recorded in 1879, because: (a) John I. Blair having died after the purchase of and payment for by him of the properties bought in at the foreclosure sale, but before the special master had executed a deed to him, Judge Hawley had

no authority to direct the special master to make such deed to DeWitt C. Blair, the sole executor and residuary legatee named in the will of John I. Blair; such will having been probated in New Jersey, and exemplified copies of the probate proceedings filed in Nevada on which letters of administration with the will annexed were thereafter granted to D. C. Blair in Nevada, but not until after the special master's deed to him.    (b) John I. Blair, as the owner of the large majority of the stock of the Silver Peak Mines, and as connected by ties of blood or friendship with the other stockholders, was in reality the corporation or, as the trial court put it, its 'alter ego,' and was therefore bound by its contracts, and it by his.  (c) By the *lis pendens* filed with the original complaint herein, John I. Blair was given notice of the plaintiffs' claims and should have made them parties defendant in his foreclosure suit, and, not having done so, they are not barred by the decree against the Siver Peak Mines and Hanchett obtained therein.    (d) By reason of the contract of the Silver Peak Mines with Hanchett, and of the substantial identity of John I. Blair and Silver Peak Mines, John I. Blair is estopped from enforcing his mortgage against the properties named in the Hanchett contract."

*Samuel Platt* (*Rush Taggart, Clarence Blair Mitchell,* and *Bartlett & Thatcher*, of Counsel), for Appellants:

Plaintiffs entirely failed to make a case.  They were not parties to the options under which they now claim and show no right to enforce the same.  They furnished no evidence of the existence of a partnership *inter sese*, much less of any knowledge thereof by the Silver Peak Mines or John I. Blair.  Whatever arrangements may have existed between Gamble, Hanchett, Wright and Chadbourne with reference to the Silver Peak Mines related only to an interest in the results of the successive options obtained, and each arrangement was limited to a particular option.  Any such interest in the results was dependent upon the performance by the optionee named

in such option of the conditions therein prescribed. Their contract or arrangement, in regard to the Silver Peak Mines, if any existed, was enforceable only as between themselves, and created no rights against the Silver Peak Mines or John I. Blair under the agreements in which plaintiffs were not named as parties. Plaintiffs can and do claim only through the Hanchett option of September 7, 1894, and are therefore bound by the judgments obtained against Hanchett with respect to that option in the federal courts.

There is in all cases a strong presumption against any one being a party to a written instrument under seal in which he is not named, and in general it is not permissible to show that the real parties to such an instrument were not those named. (*Stanton* v. *Granger* (1908), 125 App. Div. (N. Y. Supreme Ct.) 174, 109 N. Y. Supp. 134, affirmed without opinion, 193 N. Y. 656, 87 N. E. 1127; *Van Allen* v. *Peabody* (1906), 112 App. Div. (N. Y. Supreme Ct.) 57, 97 N. Y. Supp. 1119 (appeal dismissed, 187 N. Y. 532), 80 N. E. 1121.)

Although a principal may sometimes sue under a contract made by his agent in the latter's own name, he cannot do so where the agent is contracted with on the strength of statements made by him, as in this case, that he is the real or only party in interest, and there is nothing in the instrument itself to suggest the contrary. (*Ferguson* v. *McBean*, 91 Cal. 63; *Chandler* v. *Coe*, 54 N. H. 561; *Gillig* v. *Road Co.*, 2 Nev. 216; *W. S.* v. *Parmlee*, 1 Paine's C. C. Rep. 352.)

One dealing with an agent acting within the limits of his power and for the benefit of his principal is not compelled against his own wishes to contract either a known or unknown principal. The law in this respect is nicely stated in *Sullivan* v. *Shailor*, 70 Conn. 733, 40 Atl. 1054. (Story Ag. sec. 423; Mechem Ag. 771; *Humble* v. *Hunter*, 12 Q. B. 310; *Winchester* v. *Howard*, 97 Mass. 303; *Moore* v. *Vulcanite Portland Cement Co.*, 121 App. Div. 667, 106 N. Y. Supp. 393; *Birmingham Matinee Club* v. *McCarty*,

152 Ala. 571, 44 South. 642; *Usher* v. *Waddington,* 62 Conn.
412, 26 Atl. 538; *Snow* v. *Nelson,* 113 Fed. 353, 357-8;
*Cowan* v. *Curran,* 216 Ill. 598, 75 N. E. 322.)

The law of undisclosed principals has, however, no
place in this case, if plaintiffs deny that Hanchett was
authorized to make the contract of September 7th in his
own name on their behalf.

How, then, do plaintiffs connect themselves with the
Wright option of June 23, 1894, or the Hanchett option
of September 7, 1894? There is no pretense that either
of said options was ever assigned or attempted to be
assigned to plaintiffs, so that they now stand as substi-
tuted parties thereunder. Plaintiffs' claim, as we under-
stand it, is that as alleged "partners" or joint adventurers
by agreement among themselves for the single purpose
of acquiring options on the properties belonging to the
Silver Peak Mines, each of them acquired an equal undi-
vided fractional interest in any option on said properties
which might thereafter be obtained by any of their num-
ber, or by an outsider through default or bad faith of one
of their number; and that such interest is enforceable
by each of the alleged "partners," not only as between
themselves or as against Wright or Hanchett, or with
reference to the fruits and profits of the option after per-
formance by the parties named therein to perform, but
also directly against the givers of the option who, as is
claimed by plaintiffs, had notice of their alleged joint
venture. Plaintiffs further assert that the moment an
option was given to Wright or Hanchett the latter acquired
a real estate interest in the properties herein described,
and that plaintiffs also, to the extent of their alleged
interests in the "partnership," acquired an equitable undi-
vided fractional interest in the properties embraced in
such option.

A careful examination of the evidence shows conclu-
sively that such relationship at the most went no further
than an agreement to share in the fruits or profits of any
option which might be obtained by any one of them in
respect to the properties. The undisputed evidence as

to this relationship rests upon three agreements in writing.

There is a wide difference between assigning the moneys or profits to arise out of the performance of a contract and the contract itself or obligation to perform it. The former merely transfers the benefits to be derived from performance, while the latter transfers the obligation to perform, which cannot be done where it is personal with the party who has undertaken it. (*Hipwell* v. *Nat. Surety Co.*, 130 Iowa, 669, 105 N. W. 322; *Sharp* v. *Edgar*, 1 Sandf. (N. Y. Super.) 379; *Fortunate* v. *Patten*, 147 N. Y. 277, 282; *Delaware County* v. *Diebold Safe and Lock Co.*, 133 U. S. 494; *Brace* v. *City of Gloversville*, 167 N. Y. 452, 457.)

It is true that there is testimony by Gamble and Chadbourne, given many years after the happening of the events to which they relate, to the effect that they and Wright had by oral understanding formed a "partnership" for the purpose of exploiting the Silver Peak Mines, but we are confident that this testimony, and the other evidence introduced by plaintiff, when analyzed, shows that the alleged "partnership" rested solely upon and was limited to the agreements above referred to, and that the sole object of any such association was to share in the profits or fruits of any option which might be obtained by any one of the associates after a performance by such associate.

The testimony and correspondence show conclusively not only that any agreements between Gamble, Chadbourne, Wright and Hanchett did in fact relate solely to the fruits or profits of any option which any one of them might obtain from the Silver Peak Mines, and was enforceable only as between themselves, but that they themselves understood such to be the case. The indications of this appear directly and indirectly throughout the entire record.

The evidence fails to show that John I. Blair or the Silver Peak Mines had knowledge of any "partnership" or joint adventure between Gamble, Chadbourne and

Wright, or that the Silver Peak Mines, when giving the Wright and Hanchett options, knew that they were contracting with any parties other than the optionees named therein.

Even had the relations of plaintiffs been those of "partners" as they now allege, and were such fact material, notice of such alleged partnership was never brought home to Canda or the Blairs in the Silver Peak Mines.

Although from defendants' standpoint, it makes little difference whether or not the Silver Peak Mines or John I. Blair knew of the alleged "partnership" with respect to the various contracts under consideration, since it is defendants' contention that the same could relate only to the proceeds or profits of such contracts if performed by the parties named therein, nevertheless the defendants have consistently denied that they had any such knowledge, and it is respectfully submitted that a careful examination of the evidence as a whole sustains them on this point.

More significant than any testimony of Canda or Hanchett in this respect are Gamble's own letters to Canda of December 12 and 30, 1894, and January, 1895, written shortly after the happening of the events to which they refer, and intended to state Gamble's own claims and understanding in the premises.

The question as to the nature and extent of Hanchett's interest under the contract of September 7, 1894, in relation to the properties herein described had been repeatedly passed upon by courts of competent jurisdiction previous to Judge Pike's decision herein. (*Garrard* v. *Silver Peak*, 76 Fed. 1; *Blair* v. *Silver Peak Mines*, 84 Fed. 737; *Blair* v. *Silver Peak Mines*, 93 Fed. 337; *Hanchett* v. *Blair*, 100 Fed. 823; *Bostwick* v. *Hess*, 80 Ill. 138, 143; *Mendenhall* v. *Klinck*, 51 N. Y. 246, 250-1; *Cahoon* v. *Bayaud*, 123 N. Y. 298, 302-3; *Richardson* v. *Hardwick*, 106 U. S. 252, 254; *Clarno* v. *Grayson*, 30 Or. 111, 46 Pac. 426, 430; *Gustin* v. *School District*, 94 Mich. 502, 505, 54 N. W. 156; *Cameron* v. *Shumway*, 146 Mich. 634, 640-1,

113 N. W. 287; *Myers* v. *J. J. Stone & Son*, 128 Iowa, 10, 12, 102 N. W. 507, 104 N. W. 372; *Sheehy* v. *Scott*, 128 Iowa, 556, 104 N. W. 1139, 1141; *Nelson* v. *Stephens*, 107 Wis. 136, 145, 82 N. W. 163, 166; *Bras* v. *Sheffield*, 49 Kan. 702, 710, 31 Pac. 316; *Caldwell* v. *Frazier*, 65 Kan. 24, 27–9, 68 Pac. 1076; *Kruht* v. *Phares*, 103 Pac. 117; *Benedict* v. *Pincus*, 191 N. Y. 377, 84 N. E. 284; *Verstine* v. *Yeaney*, 210 Pa. St. 109, 110, 114, 59 Atl. 689; *Sternbridge* v. *Sternbridge's Admr.*, 87 Ky. 91, 94, 98 S. W. 611; *Litz* v. *Goosburg*, 93 Ky. 185, 19 S. W. 527, 21 L. R. A. 127, note; *Smith* v. *Jones*, 21 Utah, 270, 60 Pac. 1104; *Smith* v. *Bangham*, 104 Pac. 689, 692; *Williams* v. *Lilley*, 67 Conn. 50, 63, 34 Atl. 765, 769; *Rease* v. *Kittle*, 56 W. Va. 269, 278, 49 S. E. 150, 154; *Dyer* v. *Duffy*, 39 W. Va. 148, 156, 19 S. E. 540, 543; *Dunnaway* v. *Day*, 163 Mo. 415, 63 S. W. 731; *Emery* v. *League*, 31 Tex. Civ. App. 474, 72 S. W. 603; *Milwaukee Mechanics Ins. Co.* v. *B. S. Rhea & Son* (6th C. C. A.), 123 Fed. 9, 11; *Phœnix Ins. Co.* v. *Kerr* (8th C. C. A.), 129 Fed. 723, 727.)

Plaintiffs' rights, if any, in relation to the Hanchett contract of September 7th, being of the character hereinbefore described, they are bound by the judgments obtained by the Silver Peak Mines against Hanchett in the federal courts in respect to said contract, or, were it otherwise, there is no evidence in this case which would justify the court in reaching a conclusion different from that of the federal courts.

The decree of foreclosure and sale obtained by John I. Blair against the Silver Peak Mines and Hanchett in the United States Circuit Court, District of Nevada, which was affirmed by the Circuit Court of Appeals on the appeal taken therefrom by Hanchett, determined that Hanchett had no right to the possession of the mortgaged premises under his expired option of September 7, 1894, and had no estate, right, title or interest therein, and said decree and the sale had thereunder vested an absolute title to the premises in said Blair, as purchaser at the foreclosure sale, and in those claiming under him.

The filing of the second amended complaint by the

plaintiff after the exercise by the federal court of its exclusive jurisdiction in rendering a decree of foreclosure and sale of the property could not vest in the state court any right or jurisdiction to relitigate or determine any of the questions relating to the Blair mortgage or the Blair judgment which had previously been determined in the federal court.

This proposition is fully supported by the decision in the case of *Heidritter* v. *Elizabeth Oil Cloth Co.*, 112 U. S. 294 (1884).

Under any theory of the pleadings and evidence John I. Blair was not compelled to make any of the plaintiffs herein parties defendant in his foreclosure suit, and it would have been unusual and improper practice for him to have so joined them as parties defendant. (*Western Union Telegraph Co.* v. *Ann Arbor R. Company*, 90 Fed. 397; Ency. Pl. & Pr. vol. 9, p. 345; *McDermott* v. *Burke*, 16 Cal. 580; *Barelli* v. *Szymanski*, 14 La. Ann. 47.)

John I. Blair was not estopped from foreclosing his mortgage, and this action, which seeks to recover possession of the property, wholly ignoring the mortgage foreclosure and the rights of those claiming under the foreclosure sale, cannot be maintained. (*Burns* v. *Heatt*, 149 Cal. 617, 87 Pac. 196; *Townshend* v. *Thomson*, 139 N. Y. 152; *Croner* v. *Cowdrey*, 139 N. Y. 471; *Bryan* v. *Kales*, 162 U. S. 411, affirming 3 Ariz. 423 (31 Pac. 517); *Bryan* v. *Brasius*, 162 U. S. 411, affirming 3 Ariz. 423 (31 Pac. 519); *Bryan* v. *Pinney*, 162 U. S. 419, affirming 3 Ariz. 412 (31 Pac. 548); *Romig* v. *Gillett*, 187 U. S. 111 (subsequent proceedings 17 Okl. 324; 87 Pac. 325); *Stouffer* v. *Harlan*, 68 Kan. 140, 74 Pac. 612, 64 L. R. A. 320; *Equit. Mtge. Co.* v. *Gray*, 68 Kan. 102, 74 Pac. 615; *Jones* v. *Standerferd*, 69 Kan. 513, 77 Pac. 271; *Kelso* v. *Norton*, 65 Kan. 778, 70 Pac. 896; *Currier* v. *Teske*, 82 Neb. 315, 117 N. W. 712; *Dougherty* v. *Kubat*, 67 Neb. 269, 93 N. W. 317; *Cooke* v. *Cooper*, 18 Or. 142, 22 Pac. 945; *Chambers* v. *Bookman*, 67 S. C. 455, 46 S. E. 46; *Finlayson* v. *Peterson*, 11 N. D. 54, 89 N. W. 860; *Walker* v. *Warner*, 179 Ill. 24, 53 N. E. 597; *Invest. Secur. Co.* v. *Adams*, 37 Wash. 211,

79 Pac. 626; *Sloane* v. *Lucas*, 37 Wash. 348, 79 Pac. 949; *Sawyer* v. *Vermont Loan and Trust Co.*, 41 Wash. 524, 84 Pac. 8.)

The trial court failed to give to the federal judgments and decrees pleaded by the defendants herein the force, meaning and effect to which they were entitled, and thereby deprived defendants of rights, privileges and immunities which belonged to them under an authority of the United States. (*Lang et al.* v. *Choctaw, Oklahoma and Gulf R. Co.*, 160 Fed. 355; *Chicot Co.* v. *Sherwood*, 148 U. S. 529; *Julian* v. *Central Trust Co.*, 193 U. S. 112; *Wabash R. R. Co.* v. *Adelbert College*, 208 U. S. 38; *Barber Asphalt Paving Co.* v. *Morris*, 132 Fed. 945; *Brun* v. *Mann*, 151 Fed. 145; *Pitt* v. *Rodgers* (9 C. C. A.), 104 Fed. 387, affirming 96 Fed. 668; *St. Louis Mining Co.* v. *Montana Mining Co.*, 148 Fed. 450; *Guardian Trust Co.* v. *Kansas City and Southern R. Co.*, 146 Fed. 337.)

The contract through which plaintiffs claim is of such a character that in no event could its specific performance be decreed, and, were this not the case, the plaintiffs, by their conduct and representations during the life of the contract and by their laches in regard to the institution and prosecution of this suit, have forfeited any right to specific performance which they might have had originally, and the notorious change which has occurred in the value of the properties since the options on them were given some fifteen years ago would render their enforced sale now on the terms named in said options inequitable, and therefore not to be decreed.

The nature of all mining transactions is such as to render time essential. The principle that time may become the essence of a contract for the sale of property, not only by the express stipulation of the parties, but from the nature of the property itself, has been frequently recognized. It is peculiarly applicable to mineral properties, which undergo frequent and great fluctuations in value, and as to such properties the parties interested are required to be vigilant and active in asserting their rights.

The plaintiffs Gamble and Chadbourne have been guilty of flagrant laches in the institution and prosecution of their suit, and the defendant Wright never at any time previous to the entry of judgment herein asserted any claims whatever in the premises.

The mere filing of a suit for specific performance is not a sufficient display of diligence unless the suit be diligently prosecuted thereafter.

*J. W. Dorsey,* for Plaintiffs-Respondent, and *J. W. Dorsey* (*R. M. F. Soto,* of Counsel), for Defendants-Respondent:

The facts, if they be such, that this case is novel, and that there is no precedent for such a suit, afford no reason for denying jurisdiction to a court of equity to grant the relief sought. (*Dougherty* v. *Creary,* 30 Cal. 290; *Taylor* v. *Fales,* 116 N. W. 1031; *Sheebly* v. *Fales,* 116 N. W. 1031; *Williamson* v. *Monroe,* 101 Fed. 332, 335; *Britton* v. *Supreme Council,* 18 Atl. 675, 46 N. J. Eq. 102, 19 Am. St. Rep. 376, 385; *Toledo A. A. & N. M. Ry. Co.* v. *Pennsylvania Co.,* 54 Fed. 746; *Joy* v. *St. Louis,* 138 U. S. 1, 11 Sup. Ct. 243; *Piper* v. *Hoard,* 13 N. E. 626, 107 N. Y. 6, 73, 76, 1 Am. St. Rep. 789, 791, 792; *Columbian Athletic Club* v. *State,* 40 N. E. 914, 2 Redf. R. R., 6th ed. 419, 915–916; *Bechtel* v. *Wier,* 152 Cal. 443; *Southern Pacific Co.* v. *Robinson,* 132 Cal. 408; *Weinstock, Lubin & Co.* v. *Marks,* 109 Cal. 529, 50 Am. St. Rep. 57; *Lindeke* v. *Associates Realty Co.,* 146 Fed. 630.)

This is in accordance with the maxim that: For every wrong there is a remedy.

Courts are not organized and maintained to lay down rules of law, under and by which designing persons may perpetrate frauds upon their neighbors or those with whom they deal, but, on the contrary, one of the highest duties of courts, and especially of courts of equity, is and should be to sacredly guard and protect against fraud, and in case of fraud to secure to the injured party his legal and equitable rights. The maxim that for every wrong there is a remedy should not be lost sight of in

the administration of the law and the application of the principle of equity. (*McCoy* v. *McCoy*, 69 N. E. 193, 195, 32 Ind. App. 38, 43-4, 102 Am. St. Rep. 223, 227; *School District* v. *Holt*, 127 S.W. 462, 464-5.)

The first option given by John I. Blair must be treated in equity as granting Gamble an option to purchase the mining property, inasmuch as Blair owned all the capital stock of Silver Peak Mines, except some few shares which he, nevertheless, could control at will. He was practically, and in a court of equity for the purpose of administering justice must be considered, the owner of the property. (Thom. Corp., sec. 8403; *Swift* v. *Smith*, 65 Md. 428, 57 Am. Rep. 336, 5 Atl. 534; *Union R. Co.* v. *Chicago, R. I. & P. R. Co.*, 163 U. S. 564, 41 L. Ed. 265; *Louisville Bkg. Co.* v. *Eiseman Bros.*, 94 Ky. 83, 19 L. R. A. 684, 21 S. W. 531, 1049; *Barr* v. *New York, L. E. & W. R. Co.*, 125 N. Y. 263, 26 N. E. 146; *Potts* v. *Schmucker*, 84 Md. 535, 35 L. R. A. 392, 36 Atl. 592; *Des Moines Gas Co.* v. *West*, 50 Iowa, 16; *Home Fire Insurance Co.* v. *Barber*, 60 L. R. A. 927.)

The corporation is, indeed, but an agency adopted by the stockholder for the transaction of business. (*Kennedy* v. *California Sav. Bank*, 97 Cal. 93, 96, and cases there cited, 33 Am. St. Rep. 163; *McGowan* v. *McDonald*, 11 Cal. 57, 71, 52 Am. St. Rep. 149; *Thorb* v. *Beaudry*, 56 Cal. 446, 450; *Hunt* v. *Davis*, 135 Cal. 31, 34; *Charter* v. *S. F. Refining Co.*, 19 Cal. 219, 246-7; *Cornell* v. *Crobin*, 64 Cal. 197, 200; *Rice's Appeal*, 79 Pa. St. 204; *Price* v. *Holcomb*, 56 N.W. 407, 412, 89 Iowa, 123; *Keokuk E. Ry. & P. Co.* v. *Weismann*, 126 N.W. 60; *Donovan* v. *Purtell*, 75 N. E. 334, 337-8, 216 Ill. 629; *Des Moines Gas Co.* v. *West*, 50 Iowa, 16.)

The Silver Peak Mines was but the mere agent of John I. Blair. (*Union Traction Co.* v. *Chicago*, 199 Ill. 579, 633-7, and cases cited at p. 637, 65 N. E. 470, 490; *Day* v. *Postal Tel. Co.*, 7 Atl. 608, 611-4, 66 Md. 354, 363-370; *State* v. *Milbrath*, 120 N. W. 252, 255-6; *Haynes* v. *Kenosha St. Ry. Co.*, 119 N. W. 578; *Potts* v. *Schmucker*, 84 Md. 535, 57 L. R. A. 392; *Hoffman Co.* v. *Coal Co.*, 16 Md. 456, 77 Am. Dec. 311; *In re Rieger*, 157 Fed. 609, 612-5, and cases

there cited; *Re Muncie Pulp Co.*, 139 Fed. 546, 547-8, 71 C. C. A. 530; *North American Restaurant* v. *McElligot*, 81 N. E. 388, 389-390, 227 Ill. 317, affirming 129 Ill. App. 498; *Miller & Lux* v. *Rickey*, 146 Fed. 574, 584-5.)

An examination of the authorities cited above must satisfy this court that Silver Peak Mines was, as decided by the trial court, and stated in its opinion, the *alter ego* of John I. Blair. (*Southern R. I. Co.* v. *Walker*, 211 U. S. 603, 606-7.)

The right acquired by an optionee under a contract granting him the privilege of purchasing real property within a fixed period is assignable, and of such a nature as to create an encumbrance upon the property, and is descendible. (*Schroder* v. *Gemeinder*, 10 Nev. 355, *passim; Prout* v. *Roby*, 15 Wall. 472, 476, 21 L. Ed. 58; *Laffan* v. *Naglee*, 9 Cal. 662, 676, 70 Am. Dec. 678; *Menger* v. *Ward*, 87 Tex. 622, 626, 30 S. W. 853, 854, and cases there cited; *De Rutte* v. *Muldrow*, 16 Cal. 505, 513; *Perkins* v. *Hadsell*, 50 Ill. 216; *House* v. *Jackson*, 32 Pac. 1027, 1028-9, 24 Or. 89; 21 Am. & Eng. Ency. Law, 2d ed. 935; *Shelburne* v. *Beddulph*, 6 Bro. P. C. (Toml. Ed.) 363; *Albert Brick Co.* v. *Nelson,* 27 N. Bruns. 276; *Irwin* v. *Simonds*, 11 N. Bruns. 190; *Napier* v. *Darlington*, 70 Pa. St. 64; *Kerr* v. *Day*, 14 Pa. St. 112, 53 Am. Dec. 526; *Bank of Louisville* v. *Baumeister*, 87 Ky. 6; *Barrett* v. *McAllister*, 33 W. Va. 738; *Lazarus* v. *Hellman*, 11 Abb. N. C. 93; *Ross* v. *Parks*, 93 Ala. 153, 11 L. R. A. 148; *Watts* v. *Keller*, 56 Fed. 1, 4, and cases cited.)

The trial court properly held that the option given to Gamble and his associates vested them with such right of interest in the subject-matter thereof as made them necessary parties to the foreclosure suit of John I. Blair. (Comp. Laws, 2713; *Hopkins* v. *Noyes*, 2 Pac. 280, 282-3, 4 Mont. 550; *Goller* v. *Felt*, 30 Cal. 481, 484-5.)

It is respectfully submitted that Gamble and his associates under the several options claimed on their behalf, including all of those executed by the Silver Peak Mines, acquired right within the meaning of the definition of

the terms "lands" and "estate and interest in lands" as defined by the statutes of Nevada, *supra*.

Pending the existence of the options the optionee had the right to the possession of the property in question "for mining and other purposes." (*Sullivan* v. *Sullivan*, 66 N. Y. 37, 41, 42; *Pennachio* v. *Greco*, 94 N. Y. Supp. 1061, 1062, 107 App. Div. 225; *Rice* v. *Frayser*, 24 Fed. 460, 463; *Tidwell* v. *Chiricahua Cattle Co.*, 53 Pac. 192, 195-6, and cases there cited, 5 Ariz. 352; *Foust* v. *Territory*, 58 Pac. 728, 729, and authorities cited, 8 Okl. 541; *Casey* v. *Mason*, 59 Pac. 252, 254, 8 Okl. 665.)

Under the express terms of the several options given by the Silver Peak Mines, whether to Gamble, Wright or Hanchett, the optionee was entitled to be put in the actual possession of the mining properties which were the subject-matter of the several options. (*Pierce* v. *Edwards*, 150 Cal. 650, 652-656, 89 Pac. 600, 601-3; *Benson* v. *Shotwell*, 87 Cal. 49, 54, 58-9, 25 Pac. 249, 250, 252.)

This court is not bound by the decision of Judge Hawley, construing the Hanchett option. That decision is, as to the present plaintiffs, and those claiming under John B. Wright, deceased, other than Hanchett, *res inter alios acta*. This court is at liberty to use its own independent judgment on the subject, untrammeled by Judge Hawley's ruling.

This same observation may be made as to all other decisions of Judge Hawley, or of the United States Circuit Court of Appeals, bearing on the subject-matter here in litigation. Those decisions are binding only on Hanchett so far as his individual interests were concerned.

It is submitted that Gamble and his associates acquired such rights under the several options as made them necessary parties to the foreclosure suit commenced by John I. Blair, so that their rights could not be cut off or foreclosed, unless they were made parties defendant to that suit. (*Barrett* v. *McAllister*, 11 S. E. 220, 227-8, 33 W. Va. 738; *Whitney* v. *Higgins*, 10 Cal. 547, 551, 70 Am.

Dec. 748, 750–1; *In re Smith*, 4 Nev. 254, 258; *Rosina* v. *Trowbridge*, 20 Nev. 105, 112, 17 Pac. 751, 754–5.)

The facts in the case fail to disclose laches either in commencing or in prosecuting the suit to enforce the rights of Gamble and his associates.

The suit was commenced with proper dispatch as soon as Gamble learned that his rights were repudiated by the Silver Peak · Mines, and that Hanchett was claiming, for his exclusive benefit, all rights arising out of the option of September 7, 1894.

Although the original suit was commenced in the name of Gamble as sole plaintiff, the scope of the relief to which Gamble, Chadbourne and Wright would have been entitled as against Hanchett and the Silver Peak Mines, under the facts alleged in the complaint, was precisely that to which they are entitled upon the facts alleged in the third amended and supplemental complaint.

The suit has been prosecuted with due diligence. Whatever delay has occurred has been acquiesced in or consented to by the principal defendants, or has been occasioned by their efforts, after removal thereto, to retain this cause in a federal tribunal for trial. Twice they opposed the plaintiffs' motion to remand the cause thence to the state court. This is shown by the papers in the case. There is nothing in the record to indicate that the delay has in any manner injured the principal defendants; or that the properties involved have increased in value. (16 Cyc. 158–159, and cases in notes; 18 Am. & Eng. Ency. Law, 2d ed., 111–112.)

The doctrine of laches, as understood in courts of equity, implies injury to the party relying upon it as a defense. Where the situation of the parties has not been altered, and one has not been put in a worse condition by the delay of the other, the defense of laches does not apply. (*Parker* v. *Bethel Hotel Co.*, 31 L. R. A. 706; *Paschal* v. *Hinderer*, 28 Ohio St. 568; *Taswell* v. *Saunders*, 13 Gratt. 354.)

When the present counsel for the plaintiffs were called in, some time in the year 1903, it was found expedient to

file a third amended complaint, with supplementary mat-
ter added.   The new parties came in voluntarily; no
objection was made by them or by the Silver Peak Mines
to the filing of the third amended and the supplemental
complaint; no demurrer was interposed because of laches,
or on any other ground; but upon filing their respective
answers the foreign corporate defendants and DeWitt
Clinton Blair, individually and in his representative
capacity, at once, on March 20, 1905, removed the cause
to the United States Circuit Court for the District of
Nevada.   Immediately the plaintiffs, specially appearing
therefor, upon notice filed April 3, 1905, on April 18, 1905,
moved to remand the cause to the state court.   The
defendants last named by their local counsel, reenforced
by the present counsel from New York City, Rush Tag-
gart, Esq., and Clarence Blair Mitchell, Esq., opposed and
succeeded in defeating the motion.   Subsequently testi-
mony was taken in the cause under the equity rules of
the federal courts, until shortly after the decision of the
United States Supreme Court in *Ex Parte Wisner*, 203
U. S. 449, when the plaintiffs moved anew for a remand,
which motion, though opposed by Mr. Platt and Judge
Murphy, who had left the bench, was granted May 8, 1907.

The cause was retained in the federal court from
March 20, 1905, until May 9, 1907, when the order of
remand was made, but not filed till June 9, 1907.

Laches is an equitable doctrine applied to work out
equitable results.   (*Adams* v. *Gosson*, 129 S. W. 16; *Stew-
art* v. *Finkelstone*, 92 N. E. 37; *Meigs* v. *Pinkham*, 112
Pac. 883; *Harris* v. *Deffenbaugh*, 109 Pac. 681, 82 Kan.
765; *Brun* v. *Mann*, 151 Fed. 145.)

The findings of the trial court show beyond cavil that
the defendants against whom judgment was rendered
have no equities in their favor.   (*Northern Pac. Ry. Co.*
v. *Boyd*, 177 Fed. (C. C. A.) 804, affirming 170 Fed. 779,
808.)

The record clearly shows that whatever delay has
occurred in bringing the case to a trial was either acqui-
esced in or caused by the principal defendants, appellants

herein. (*Citizens' Savings and Trust Company* v. *Illinois Cent. R. Co.*, 182 Fed. 607; *Dickinson* v. *Stevenson*, 120 N. W. 324; *Stevenson* v. *Boyd*, 153 Cal. 630.)

Laches as an equitable bar to relief depends upon the circumstances of each case and, except in case of clear error, the trial court's judgment denying its effectiveness will not be disturbed. (*Hudson* v. *Herman*, 107 Pac. 35, 81 Kan. 627; *Harrison* v. *Rice*, 114 N. W. 151–153; *Broatch* v. *Boysen*, 175 Fed. 702, 99 C. C. A. 278, 283; *London and San Francisco Bank* v. *Dexter, Horton & Co.*, 126 Fed. 593–601, 61 C. C. A. 515, 523; *Kelley* v. *Boettcher*, 85 Fed. 55–62, 29 C. C. A. 14, 21.)

In the case at the bar the plaintiffs were seeking to obtain the possession of the mining properties in controversy in order to enable them to explore the same and put them in a position to determine whether or not they would exercise the option granted by Exhibit D. In other words, they were endeavoring to enforce their right to the possession of the properties in question, a right ordinarily enforceable by law. But by reason of the repudiation of the contract by the principal defendants the plaintiffs were compelled to go into equity to establish the existence as well as the validity of the contract, and there to obtain complete relief by securing an award of damages or an accounting. It is submitted, therefore, that by analogy the statute of limitations governing actions in ejectment should control.

There was no legal excuse for the removal of this cause to the federal court from the state court; much less for the opposition to the application to have it remanded. (*Ex Parte Wisner*, 203 U. S. 449; *In re Winn*, 213 U. S. 458, 53 L. Ed. 873, 875; *Re Pollitz*, 206 U. S. 323, 332–3; *Ex Parte Nebraska*, 209 U. S. 436, 443–4; *Bottoms* v. *St. Louis & S. F. R. Co.*, 179 Fed. 318–320; *Pollitz* v. *Wabash R. Co.*, 176 Fed. 333, 335; *Murdock* v. *Martin*, 178 Fed. 307; *Clark* v. *S. P. Co.*, 175 Fed. 122, *passim;* *Mahopoulus* v. *Ry. Co.*, 167 Fed. 165, *passim;* *Foulk* v. *Gray*, 120 Fed. 156, *passim;* *Friboring* v. *Pullman Co.*, 176 Fed. 981, 983–5.)

The appellants cannot allege laches because they could have brought the cause to a hearing either on questions or issues of law or of fact; or, if the plaintiffs were negligent in prosecuting their suit, the appellants could have had the cause dismissed for want of prosecution. (Comp. Laws, 3254 (see secs. 3248–3253); *People* v. *Jefferds*, 126 Cal. 296, 300; *Tomkin* v. *Harris*, 90 Cal. 206; *Clune* v. *Quitzaw*, 125 Cal. 213–4; *McGuire* v. *Drew*, 83 Cal. 225, 229–230; *Kubli* v. *Hawkett*, 89 Cal. 225, 229–230; *Mowry* v. *Weiserborn*, 137 Cal. 110, 113–4; *San Jose L. & W. Co.* v. *Allen*, 129 Cal. 247, 249–250; *Woods* v. *Diepenbrock*, 141 Cal. 55, 57; *Dans* v. *Clerk*, 126 Cal. 232, 234–5; *Martin* v. *San Francisco*, 131 Cal. 575, 576; *Purdy* v. *Montgomery*, 77 Cal. 326, 327; *Keller* v. *Simmons*, 50 Cal. 38, 39; *Barnard* v. *Parmelee*, 6 Cal. App. 537; *Marks* v. *Keenan*, 148 Cal. 161–2; *Ferris* v. *Wood*, 144 Cal. 26, *passim; McDonald* v. *Swell*, 76 Cal. 257, 259; *People* v. *Latham*, 53 Cal. 386, 388 (126 Cal. at 300); *Hubbell* v. *Lankerman*, 63 Fed. 881; *Picquett* v. *Swan*, 5 Mason, 561, 19 Fed. Cas. 617, 619, 620; *Houston* v. *San Francisco*, 47 Fed. 337–339; *Jessup* v. *R. Co.*, 36 Fed. 735–6, 741; *Clever* v. *Smith*, 29 N. E. 682, 683; 1 Foster Fed. Pr., 3d ed., secs. 293–4; *Barcroft* v. *Swan*, 9 N. E. 539, 542, and cases there cited.)

The defendants must, therefore, be held to have acquiesced in the alleged delay. (*Jerrett* v. *Mahan*, 20 Nev. 97, 98, citing *Baird* v. *Moses*, 21 Ga. 249, 251, and *Nevada Co. Canal Co.* v. *Kidd*, 28 Cal. 673, 684; compare *Griffith* v. *Gruner*, 47 Cal. 644–646; *Wyman* v. *Gruner*, 26 Mont. 227, 238–9.)

The defense of laches should have been pleaded so as. to afford the plaintiffs an opportunity to explain or excuse any apparent delay with which they are now charged. (*Hill* v. *Barner*, 8 Cal. App. 58, 63, 96 Pac. 111, 113; *Lux* v. *Haggin*, 69 Cal. 255, 267, *et seq.*, and *passim; Wills* v. *Nehalem Coal Co.*, 96 Pac. 528, 535; *Spalding* v. *Macomb & W. I. Ry. Co.*, 80 N. E. 327, 329; *Blakely* v. *Canal Co.*, 73 Pac. 249, 252.)

Neither Gamble nor any one of his associates was compelled to intervene in the foreclosure suit of John I. Blair,

or to ask to be made a party defendant therein.    The right to intervene is merely permissive.    (Comp. Laws, 3694, 3695.)

"A person having a right to intervene cannot be compelled to do so.    The exercise of the right is optional." (17 Am. & Eng. Ency. Law, 2d ed. 185; 11 Ency. Pl. & Pr. 502 and notes.)

"The right to intervene may be waived."    (17 Am. & Eng. Ency. Law, 2d ed. 185; 11 Ency. Pl. & Pr. 503; *Meissner* v. *Meissner*, 35 N. W. 51, 53–4, 68 Wis. 336; compare *Gale* v. *Shillock*, 30 N. W. 138, 141, 4 Dak. 196.)

The claim that Gamble and his associates should have applied to be made parties defendant is but to contend that they should have asked for leave to intervene, which, as we have seen, was a mere optional right, if it existed.    (*Logan* v. *Greenlaw*, 12 Fed. 10, 16; *Reay* v. *Butler*, 95 Cal. 206, 214, 215.)

The evidence is sufficient to sustain the findings and judgment; and even if conflicting this court will not disturb either.

The rule of practice invoked by the appellants, if it ever was in force in this state, must be now deemed to have been abandoned, as shown by the later decisions hereinafter cited.

In support of their contention appellants cite *Feusier* v. *Sneath*, 3 Nev. 120, 131.    The announcement there made, that in chancery cases the rule as to conflict of evidence does not control the appellate court, is no longer in force in this state.

The other statement, that the appellate court is as competent as the *nisi prius* court to pass upon a conflict of evidence where the evidence is made up of depositions, was made evidently without considering the difference between the functions of an appellate tribunal and a trial court.    The latter tries the issues of fact and ascertains where the truth lies; the former merely determines questions of law, without any original jurisdiction to determine or ascertain facts.    Such jurisdiction would be exercised if counsel's contention were sustained.    Such

a practice, however, does prevail in the federal courts in equity cases. There the appellate court tries the cause *de novo* upon the entire record. (*Reay* v. *Butler*, 95 Cal. 206, 214–215; *Barnes* v. *W. U. Tel. Co.*, 27 Nev. 438; *Costello* v. *Scott*, 30 Nev. 43, 76, 77; *Tonopah L. Co.* v. *Nevada A. Co.*, 30 Nev. 445; *Tonopah L. Co.* v. *Riley*, 30 Nev. 312; *Beck* v. *Thompson*, 22 Nev. 109; *Watt* v. *Nev. Cen. R. R. Co.*, 23 Nev. 154; *Roberts* v. *Webster*, 25 Nev. 94, 95; *Crawford* v. *Crawford*, 24 Nev. 410, 417; *Palmer* v. *Culverwell*, 24 Nev. 114, 115; *Craw* v. *Wilson*, 22 Nev. 385, 389; *Devencenzi* v. *Cassinelli*, 28 Nev. 222, 231; *Welland* v. *Williams*, 21 Nev. 230; *Wilson* v. *R. R. Co.*, 94 Cal. 166, 168; *Churchill* v. *Flournoy*, 127 Cal. 355, 361; *Garton* v. *Stern*, 121 Cal. 347, 349; *Jones* v. *Sanders*, 103 Cal. 678, 679.)

The form of the judgment is in accordance with well-settled principles of equity jurisprudence. It awards no relief to which the plaintiffs and the Wrights are not entitled under the evidence.

Equity grants such relief only as the nature of the case and the facts, as they exist, not at the beginning, but at the close of the litigation, demand. (*Peck* v. *Goodberlett*, 16 N. E. 350, 353; *Pond* v. *Harwood*, 34 N. E. 768, 770; *Lyle* v. *Little*, 50 N. Y. Supp. 947, 948–9; *Kilbourne* v. *Board*, 33 N. E. 159, 161–2; *Baily* v. *Hornthal*, 49 N. E. 56, 60, 61 Am. St. Rep. 645; *Asbyll* v. *Harms*, 78 N. Y. Supp. 64, 66; *Superior Oil and Gas Co.* v. *Mehlin*, 108 Pac. 545, 547; *Penn. Co.* v. *Bond*, 99 Ill. App. 535; *Campbell* v. *Moorehouse*, 120 N. W. 79.)

By the Court, NORCROSS, J. (after stating the facts):

A full understanding of this case has made it necessary to make a preliminary statement of more than ordinary length. The case as submitted to this court, after fifteen years of proceedings in the district courts of the state and the Circuit Court of the United States, is comprehended in twelve volumes of some five thousand printed and typewritten pages, and the many legal questions raised are illuminated by hundreds of pages of printed briefs. Fortunately there are few, if any, material facts

in the case that may be considered from the viewpoint of conflicting evidence. While a number of depositions were offered in evidence, the main questions involved upon the merits are settled by a consideration of the written contracts entered into and the correspondence had between the several parties. All of the correspondence between the parties does not appear to be in the record, owing to the fact, doubtless, that some letters may have been lost or mislaid during the many years which elapsed before the trial was actually reached, but in the main the correspondence is in the record, and enough appears to clearly show the true status of affairs existing between the several parties which forms the subject-matter of this action.

The case is a novel one, and it is virtually conceded that there is no precedent for such a suit, but it is also conceded that, if the judgment has equity to support it, the mere novelty or lack of precedent would afford no good reason for not affirming the judgment. The insurmountable obstacle in the way of affirming the judgment, however, lies in the fact that it cannot stand the test of an application of equitable principles, but, upon the contrary, is absolutely unconscionable. The effect of this judgment is to give respondents possession of what is regarded as one of the most valuable mines in this state, and not only this, but permit them to reap the benefit of the development of this property made at the vast expense of others, acquire absolute title to eleven-fifteenths of the mine and pay for the same out of the damages to be exacted from appellants for working the property after the present owners acquired possession. And these valuable rights are to be given to the respondents Gamble, Chadbourne and Wrights, because of the fact that, during all or the major portion of the time from March 9, 1893, to September 7, 1894, a year and a half, either Gamble or J. B. Wright held an option to purchase the Silver Peak mining properties, which options they utterly failed to comply with, and the further fact, if it be a fact, that the option and extensions thereof subsequently obtained

by L. J. Hanchett, and which, also, were not fulfilled, were in equity obtained for the benefit of Gamble, Chadbourne, and the Wrights. Strong indeed would have to be the proofs of fraud upon the part of J. I. Blair or the Silver Peak Mines, or their successors in interest, that would justify the taking of this great property by respondents, practically without the direct payment of a dollar, and the ousting of others who, by the investment of vast capital, have created a great mine out of a property which Gamble repeatedly stated to the representatives of the Silver Peak Mines, during the time of his option, was not worth to exceed a hundred thousand dollars in its then condition, which was described in one of his letters, as being "worked-out stopes, valueless dumps, and barren croppings," but a mine which was deemed of such value, at the time this appeal was taken, that respondent asked the lower court to fix a $1,000,000 bond as a condition of staying the execution.

If property has been acquired by fraud, or in utter disregard of the rights of others, and such property subsequently becomes of great value, the person defrauded would not for that reason alone be debarred from recovering possession, even though he reaped an increment entirely disproportionate to any efforts put forth by himself. Such, however, is not this case. There is no proof in the record, worthy of the name, of any fraud committed by John I. Blair or the Silver Peak Mines in their dealings with the respondents in this case, while the Silver Peak Gold Mining Company, the present owner of the property, is shown to have purchased it upon the faith of certain judgments rendered by the Circuit Court and the Circuit Court of Appeals of the United States. It is true that respondents contend that these judgments are not binding upon them for the reason that they were not made parties to the suits in question, that a *lis pendens* was on file in the office of the recorder of Esmeralda County before the suits in which they were entered were instituted, and that these federal judgments and the decisions upon which they are based are erroneous,

and that we should now so hold, but, even if this conten-
tion could be concurred in, we do not think the judgment
even then could be sustained for these reasons.    Gamble
knew at least as early as the date of his letter to Canda
of December 12, 1894, that Hanchett was not consider-
ing him in on his option, yet he did not attempt to estab-
lish his rights by legal proceedings until March 2, 1896,
nearly a year and three months later, after the Hanchett
option had by its terms expired and the latter was hold-
ing by virtue of an extension which had partially expired.
Chadbourne does not appear in the action as a complain-
ing party until the filing of the second amended complaint,
July 6, 1899, over three years later.    J. B. Wright or his
heirs never did appear as complaining parties, and it is
manifest, it seems to us, that as to the Wrights the fur-
ther impediment exists to any right of recovery in their
favor on account of the fact that Wright assigned the
option in his name to Hanchett, requested the Silver
Peak Mines to deal with Hanchett, and accepted whatever
interest he had as subordinate to Hanchett.    Even if it
could be said that the judgments obtained by Blair and
the Silver Peak Mines against Hanchett were not binding
on Gamble or Chadbourne, they certainly should be held
to be binding on any interests which Wright had under the
Hanchett option.    For nearly four years after the filing
of the "second amended complaint," nothing appears to
have been done by the plaintiffs Gamble and Chadbourne
to press their suit to conclusion.    In the meantime great
changes were transpiring, not only in regard to this prop-
erty, but in relation to the whole mining industry of the
state.

    Gamble and Chadbourne, if they were diligent in look-
ing after their interests, could not have been unaware of
the litigation between Blair and the Silver Peak Mines on
the one hand and Hanchett on the other, involving the
termination of the Hanchett option.    It is true they
were not made parties to those actions, and were not
compelled to intervene to protect their rights, but it is
equally true that Gamble had previously urged the Silver

Peak Mines to repudiate its contract with Hanchett, and give another option to Gamble, who claimed to have parties with ample capital ready and anxious to take an option on the property and carry it into execution. If the record contains any evidence of an attempt upon the part of Gamble to obtain an option on this property after Blair or the Silver Peak Mines had undertaken to terminate the Hanchett option and recover possession of the property, it has not been called to our attention, nor have we discovered the same. If Gamble wanted Hanchett eliminated, as he said he did, and had financial backing sufficient to carry out a similar option, as he claimed to have, and really wanted to get possession of the Silver Peak mining property, a more opportune time was presented after the Silver Peak Mines had begun litigation to oust Hanchett than existed when he asked the company to repudiate their written agreement with Hanchett, which Canda frankly and properly informed him could not be done. It may be claimed by counsel for respondent that these observations have no place in this case, that respondents were not bound to have taken any such course, or bound to make any showing that, if they had another option, they could have made any better success of interesting capital than they made during the year and a half that they did have an option, or could have carried out the Hanchett option if they had had it. But they are in a court of equity asking practically that a mine, made immensely valuable by the efforts and money of others, be practically given them, a situation which requires the existence of the utmost good faith upon their part, ability, and readiness to perform during the time specified in the contract and an absence of laches. The showing in all these respects is woefully lacking.

In the case of *Johnston* v. *Standard Mining Company*, 148 U. S. 360, which was a bill in equity to establish the ownership of the plaintiff in one-fourth of a mining claim, and for a decree that the defendant be required to execute a deed of the same, and to account to plaintiff

for one-fourth of the net proceeds of the mine, an interlocutory decree was entered, substantially in accordance with the prayer of the bill, and an accounting ordered. The defendant immediately applied for a rehearing, and the case was reheard without reference to the grounds relied upon in the petition for rehearing which did not raise the question of laches when the case was again taken under advisement, and the court later delivered a second opinion, dismissing the bill upon the ground of laches. Thereupon plaintiff filed a petition for a rehearing upon this question which was denied without argument, and plaintiff then appealed to the Supreme Court of the United States where the judgment was affirmed. From the opinion affirming the judgment of dismissal we quote the following:

"It was not until April, 1885, more than a year after the Fulton Mining Company had obtained a patent to the property, that he made a formal demand upon Chatfield, and on August 1, 1885, filed his first bill in the Circuit Court of the United States to establish his title to a quarter interest in the lode. This suit does not seem to have been prosecuted with much diligence, since it was allowed to linger for nearly a year, and was then dismissed, apparently, for a want of jurisdiction appearing upon the face of the bill. It has been frequently held that the mere institution of a suit does not of itself relieve a person from the charge of laches, and that if he fail in the diligent prosecution of the action, the consequences are the same as though no action had been begun. (*Hawes* v. *Orr*, 10 Bush, 431; *Erhman* v. *Kendrick*, 1 Metc. (Ky.) 146, 149; *Watson* v. *Wilson*, 2 Dana, 406; *Ferrier* v. *Buzick*, 6 Iowa, 258; *Bybee* v. *Summers*, 4 Or. 354, 361.)   *   *   *

"The duty of inquiry was all the more peremptory in this case from the fact that the property of itself was of uncertain character, and was liable, as is most mining property, to suddenly develop an enormous increase in value. This is actually what took place in this case. A property which, in October, 1880, plaintiff sold to Chat-

field upon the basis of $4,800 for the whole mine is charged, in a bill filed October 21, 1887, to be worth $1,000,000, exclusive of its accumulated profits. Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the result of this development, and will require not only clear proof of fraud, but prompt assertion of plaintiff's rights. (*Felix* v. *Patrick*, 145 U. S. 317, 334; *Hoyt* v. *Latham*, 143 U. S. 553, 567; *Hammond* v. *Hopkins*, 143 U. S. 224; *Great West Mining Co.* v. *Woodmas Mining Co.*, 14 Colo. 90.)

"The language of Mr. Justice Miller in *Twin Lick Oil Company* v. *Marbury*, 91 U. S. 587, 592, with regard to the fluctuating value of oil wells, is equally applicable to mining lodes: 'Property worth thousands today is worth nothing tomorrow; and that which today would sell for a thousand dollars at its fair value may, by the natural changes of a week, or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.' We think it is clear that the plaintiff did not make use of that diligence which the circumstances of the case called for, and the decree of the court below dismissing his bill is, therefore, affirmed."

Chief Justice Fuller, writing the opinion for the court in *Willard* v. *Wood*, 164 U. S. 524, stated it to be "the recognized doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time may be applied in the discretion of the court, even though the laches are not pleaded or the bill demurred to." Further on, the opinion states: "The mere fact that the bill was left on the files would not, in itself, relieve from the effects of laches, for failure in diligent prosecution may have the same con-

sequences as if no suit has been instituted. (*Johnston* v. *Standard Mining Co.*, 148 U. S. 360, 370.) * * * The changes which the lapse of time had wrought in the value of the property and in the situation of the parties were such as to render it inequitable to decree the relief sought as against Bryan."

Cyc. says: "In the case of a mere option or other unilateral contract, or where the remedies are not mutual, delay is regarded with special strictness." (36 Cyc. 727.)

In *Hoyt* v. *Tuxbury*, 70 Ill. 332, the court said: "The rule, time and again, announced by this court, is that a party cannot call, as a matter of right, upon a court of equity to specifically enforce the performance of a contract; that its exercise rests in the sound discretion of the court, in view of the terms of the contract of the parties and surrounding circumstances. A party demanding its exercise is bound to show that he himself has always been ready, willing and eager to perform, on his part. (*Phelps* v. *Ill. Cent. R. R. Co., et al.*, 63 Ill. 468; *Stow* v. *Russell*, 36 Ill. 18; *Board of Supervisors* v. *Henneberry*, 41 Ill. 179.)"

"Where the contract is in anywise unilateral," says Fry, in his work on Specific Performance, sec. 732, "as, for instance, in the case of an option to purchase a right of renewal, or any other condition in favor of one party, and not of the other, then any delay of the party in whose favor the contract is binding, is looked at with special strictness."

In the case of *Ally* v. *Deschamps*, 13 Ves. 225, Ld. Ch. J. Erskin said: "It would be dangerous to permit parties to lie by with a view to see whether a contract would prove a gaining or a losing bargain, and according to the event, either to abandon it or, considering the lapse of time as nothing, to claim a specific performance, which is always the subject of discretion."

In *Kelly* v. *C. P. R. R. Co.*, 74 Cal. 557, the court said: "It is well settled that a court of equity may refuse specific performance of a contract which it could not set aside. Where the aid of a court of equity is sought by

way of specific performance of a contract, the principles of ethics have a more extensive sway than where a contract is sought to be rescinded. (Kerr on Fraud and Mistake, Am. ed. 357, 358.) It is an acknowledged rule in equity jurisprudence that a party entitled to a specific conveyance of property will not be permitted to hold back from an assertion of his rights, and speculate upon the possibilities of such changes as may decide whether it would be to his interest to have the conveyance made; but he is required to be vigilant and prompt in the assertion of those rights, and if changes have occurred during this lapse of time in the value of the property to be conveyed, a court of equity will always refuse its aid, and leave the party to seek redress at law. (*DeCordova* v. *Smith's Admx.*, 58 Am. Dec. 136.)"

This court by Hawley J., in *Lang Syne Mining Co.* v. *Ross*, 20 Nev. 139, 19 Am. St. Rep. 337, said: "We are well aware that the value of mining claims is ordinarily of a very fluctuating character; that, as stated by the Supreme Court of the United States in *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 592, 'property worth thousands today is worth nothing tomorrow, and that which would today sell for a thousand dollars at its fair value may, by the natural changes of a week, or the energy and courage of desperate enterprise in the same time, be made to yield that much every day. The injustice, therefore, is obvious of permitting one holding the right to an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.' In such cases the courts have repeatedly declared that the party claiming the rights to the property must 'put forward his complaint at the earliest moment,' and that he 'is bound to act with reasonable diligence as soon as the fraud is discovered.' There is nothing that can call forth a court of equity into activity 'but conscience, good faith, and reasonable diligence.' It does not affirmatively appear upon the face of the complaint in this action that, at the time of the discovery of the fraud, the plaintiff consid-

ered that the property was worthless; that it kept silent, waiting for the defendant Ross to develop the mine; and that then, after the value of the mine had been established by his labor, expense, and hazard, the plaintiff commenced this action, 'to rob him of the fruits of his industry and enterprise.' It may be that, upon issues of facts and proofs made upon the trial, such a state of facts may be presented. But our decisions upon the questions of law raised by the demurrer must be governed solely by the sufficiency of the allegations of the complaint. We have no right to anticipate what the evidence will be."

See, also, *Stevens* v. *McChrystal*, 150 Fed. 85; *Taylor* v. *Langwith*, 14 Pet. (U. S.) 172; *Crandall* v. *Willig*, 166 Ill. 240; *Gentry* v. *Rogers*, 40 Ala. 442; *Henderson* v. *Hicks*, 58 Cal. 371; Fry on Specific Performance, 732; Pomeroy on Specific Performance, 407.

That the doctrine of laches is particularly applicable to mining transactions which undergo frequent and great fluctuations in value is generally conceded. As to such properties, parties interested are required to be active and vigilant in asserting their rights. (*McKenzie* v. *Coslett*, 28 Nev. 65, 93; *Waterman* v. *Banks*, 144 U. S. 395; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Galliher* v. *Caldwell*, 145 U. S. 368; *Johnston* v. *Standard Mining Co.*, 148 U. S. 368-371; *Patterson* v. *Hewitt*, 195 U. S. 309, 321; *Curtis* v. *Lakin*, 96 Fed. 251; Pomeroy on Contracts, 384, 385; *Settle* v. *Winters*, 2 Idaho, 199, 10 Pac. 216; *Durant* v. *Comegys*, 2 Idaho, 936, 28 Pac. 425; *Idaho Gold M. Co.* v. *Union M. & M. Co.*, 5 Idaho, 107, 47 Pac. 95; *Williams* v. *Long*, 139 Cal. 186, 72 Pac. 911; *Green Ridge Fuel Co.* v. *Little*, 119 N. W. 698, 700, 141 Iowa, 221; *Gaines* v. *Chew*, 167 Fed. 630, 635; *Standiford* v. *Thompson* (4th C. C. A.) 135 Fed. 991; Fry on Specific Performance, 1082.)

It is contended by counsel for respondents that appellants are not in position to claim laches upon the part of respondents, for the reason that they either acquiesced in the delay or were directly responsible for a material portion thereof by moving the case into the Circuit Court

of the United States, but, conceding that the appellants were responsible for this latter delay, they can hardly be chargeable with the delay for the nine or ten years preceding.

While we think this case could be disposed of upon the application of the doctrine of laches, the importance of other questions involved, in view of the earnestness of the contentions of the respective parties, warrants a determination of the primal question of respondents' rights to recover, irrespective of the question of laches.

Counsel for respondents in their brief say: "Although this suit does not count on fraud as its foundation, fraud is nevertheless charged by necessary implication, for it is only because of the fraudulent acts of the defendants, in collusion with Hanchett, that the plaintiffs have been deprived of the rights which they are seeking to enforce herein."

It is the theory of respondents that all of the various options, whether held by Gamble, Wright, or Hanchett, should be regarded in effect as one continuing option; that Gamble, Chadbourne, and Wright were partners in these options; and that the Silver Peak Mines were aware of this partnership relation and executed the option to Hanchett with full knowledge of its existence and with knowledge of the fact that Hanchett was virtually the agent of the partnership, and that Hanchett in effect took the option in trust for Gamble, Chadbourne, and Wright.

Just what was the relationship existing between Gamble, Chadbourne and Wright relative to any of these options is not shown by any written evidence other than the receipt of date October 30, 1893, by the terms of which Gamble agreed "to transfer to said Chadbourne and Wright a one-third interest each in such bond as I may acquire." In the depositions of Gamble and Chadbourne, taken some thirteen years after the events had transpired, is testimony to the effect that they had a partnership arrangement by oral understanding for the purpose of exploiting the Silver Peak Mines. In Gamble's

original complaint made when his memory should have been clearer as the relations of the parties he alleges that after he had secured the option of November 13, 1893, he submitted the same to Chadbourne and Wright who then and there "agreed that they would join the plaintiff, in the formation of said corporation, and in consideration of the assignment to said corporation of the said contract, dated November 13, 1893, between the said 'Silver Peak Mines' and the plaintiff, that they would, in accordance with the said contract, furnish to said corporation a subscribed capital stock of $200,000, and would actually pay into the treasury of said corporation the sum of $30,000; and the said plaintiff and the defendants then became and, until the assignment from the said John B. Wright to L. J. Hanchett hereinafter alleged, remained copartners in said contract, each owning and being entitled to one-third of all the net profits of said contract."

The agreement, as alleged, was never complied with by Chadbourne and Wright, or either of them, for they failed to furnish the prereqisite stock subscription or actually pay into the treasury any money. Just how such an arrangement could be construed into a partnership relation is not clear. There is evidence tending to show that these parties were working in concert trying to get others interested in the property through these options who would supply the necessary money, and that this situation existed after the subsequent option was obtained in the name of Wright. Had the Wright option been carried out, Gamble and Chadbourne doubtless would have been entitled to share in the profits of the venture. But neither this nor any other option was ever carried out. More actual effort appears to have been put forth by Hanchett to carry out the option obtained in his name than was ever put forth by Gamble, Chadbourne, and Wright. Declarations oral and written made by Gamble to Canda of what he could and would do were most promising, but when it came to a matter of performance there was always a failure of anything tangible. One thing is evident from the evidence in this case, and that is that

Gamble, Chadbourne, and Wright either did not have the money themselves to put into the venture, or did not propose to risk any considerable amount thereof to carry out the options, and further, at the time they secured these options, they had nothing more in view than making an effort to interest the capital of others, and that, if they were successful in this purpose, they were to make their profits thereby.

It is clear, we think, from the evidence that Gamble, Chadbourne, and Wright were simply trying to promote a mining enterprise upon the money of others, which they were unable to obtain, and that the real status of the situation is not materially different from that of mining promotions generally which result in failure, with the exception that in this case the promoters are seeking now to acquire the benefits of some one else's money and enterprise.

It is one of the main contentions of respondents that the Silver Peak Mines was aware of the existence of the partnership alleged to exist between Gamble, Chadbourne, and Wright, and entered into the Hanchett option with full knowledge of this partnership and in fraud of their rights.

The only evidence in the record as to knowledge upon the part of the Silver Peak Mines of the alleged partnership relations existing between Gamble, Chadbourne, and Wright, in addition to the correspondence, is contained in the depositions of the said Gamble, Hanchett, and C. J. Canda relative to the negotiations which led up to the execution of the second Gamble option and the options to Wright and Hanchett. In considering the testimony contained in these depositions, it should be borne in mind that the depositions were taken some thirteen years after the events to which they relate had transpired. The memory of the witnesses in a number of instances is shown to have been defective when compared with the written evidence made at the time, and, wherever it is in conflict with such documentary evidence, we believe the latter evidence should control. There is apparently noth-

ing in the correspondence that would indicate a desire upon the part of the writers to give a false color to the situation as they understood it, and we do not understand there is any such contention in this case.

The depositions appear to to have all been taken upon the motion of the plaintiffs, and upon the trial the direct and redirect examinations were offered upon the part of plaintiffs and the cross and recross-examinations were offered upon the part of the defendants.

Relative to the negotiations for the option of November 13, 1893, from Blair to Gamble, which is the time claimed that Gamble informed C. J. Canda of the existence of the alleged partnership between himself, Chadbourne, and Wright, the testimony in the case is substantially as follows:

*Direct examination of Gamble:* Q. State what occurred between you and him (C. J. Canda). A. I submitted letters to him from different people out here, Mr. Frank S. Chadbourne, Mr. J. E. Doolittle, D. A. Bender, J. B. Wright, and maybe some others; I cannot recall them.

Q. What became of those letters? A. I left some with him, and some I have left.

Q. What did you do with them? A. I gave them to him; he read them all.

Q. What did you ask him to do, if anything? A. I asked him to make a new contract with me, extend that contract there, and make some modifications in it, which was finally done with John I. Blair.

Q. Did you see John I. Blair? A. No, sir.

Q. What did Mr. Canda say about it when you asked him for an extension? A. He granted it to me.

*Cross-examination of Gamble:* Q. Was the extension of the contract made for the benefit of yourself, or for the benefit of all the parties just named? A. For the benefit of all.

Q. Were their names subscribed to the contract? A. No, sir; but Mr. Canda had assurances from them and a proposition signed by them. He has it now.

Q. What sort of a proposition? A. A proposition that

they would take the mine up under the following conditions and would furnish the money to finance it.

Q. Was your name mentioned in these negotiations? A. Yes, sir.

Q. Can you produce any letters to that effect? A. I did not need to have any letters when I was right there during the negotiations myself. I would not write them a letter when I was there myself.

Q. Was Mr. Wright and Mr. Chadbourne and yourself present when these matters were talked over in New York? A. No, sir.

Q. Were they talked over in the presence of Mr. Canda, or any one of the Silver Peak Mines? A. No one but myself.

Q. Did you tell Mr. Canda that Mr. Wright and Mr. Chadbourne were interested with you? A. Yes, sir.

Q. How do you explain the fact that Mr. Wright and Mr. Chadbourne were not made parties to the original contract and its extensions? A. I have not any explanation to make. I do not know why they did not do it. I went off on the warpath myself.

Q. Why did you go off on the warpath? A. Well, I had an idea, at the last end of it, that Mr. Wright had taken the stand against me.

Q. Then, before the consummation, or before the first contract with Mr. Wright, you and Mr. Wright were not friendly? A. No, sir; that is not so. It was right the contrary. We were friendly. We were friendly all the time until Mr. Hanchett came into it.

Q. I asked you concerning the negotiations for the extension of the original contract wherein you said Mr. Wright and Mr. Chadbourne were not present and that those negotiations were effected personally by you with Mr. Canda. Is that correct? A. Yes, sir.

Q. I ask you again now to explain why it was that Mr. Chadbourne and Mr. Wright were not made parties to the contract, if they were interested with you? A. Well, I cannot tell you further than I had taken the contract in my own name for the benefit of the others that were

originally interested with me in the first place, and when I went back the second time I explained to Mr. Canda who the parties were, and he exacted to know who were associated with me, if they were originally interested with me, and I furnished him letters from Mr. Wright and Mr. Chadbourne stating they were interested with me and had formed a partnership to take that matter up.

Q. Have you any of those letters? A. No, sir. Mr. Canda has them.

Q. Have you a copy of those letters? A. No, there might be copies in Mr. Wright's copy-book. There were a lot of Mr. Wright's copy-books burnt. I never had those books.

Mr. Platt—I would like to see those copies.

Mr. Baker—We are doing everything we can to get them.

*Direct examination of C. J. Canda:* Q. What brought about the change in method as between the original agreement or option given Mr. Gamble and this one, Plaintiffs' Exhibit 2? A. Well, if I remember correctly, Mr. Gamble did not represent that he had any funds of his own. He was endeavoring to bring about a sale or purchase of the company's part of this property, and he had to have some assistance, and he represented he would take in other people with him.

Q. Did he mention in that connection at that time Mr. Chadbourne's name and Mr. Wright's? A. I can't remember at this moment, but he did say Mr. Chadbourne; I can't remember whether he said anything about Mr. Wright.

Q. Do you remember whether he said anything about Mr. Wright or not? A. He may have done so, I could not say. I am 68 years old, or was yesterday, and I am not as lively in my memory as I was years ago. * * *

Q. Do I understand you to say that it is your recollection that, when Mr. Gamble came here in the fall of 1893, he did mention to you that Wright was interested in the matter with him or not? A. I don't remember about that.

Q. Did you say he mentioned who Mr. Chadbourne was?  A. Yes, and the letters so show.

Q. Look at your letter of May 4, 1894, to Mr. Wright, a copy of which I hand you, and see if that does not refresh your recollection as to whether or not Mr. Gamble also mentioned Mr. Wright at that time?  A. If this is a copy of the letter, I presume that is so.

Q. Does the reading of that letter bring the matter back to your mind at all?  A. Excepting as it states it in the letter.

Q. It does not refresh your memory otherwise.  A. No.

There appears to have been no cross-examination of C. J. Canda on this point.  Relative to the negotiations which led up to the execution of the first option given to J. B. Wright the testimony is as follows:

*Direct examination of L. J. Hanchett:* Q. State your business, if any, with Mr. C. J. Canda in the month of January, 1894.  A. I went there to get an extension of the bond Mr. Gamble had on the Silver Peak Mines, to have it extended to Mr. Gamble, Mr. Wright and Mr. Chadbourne.   *   *   *

Q. State what you said to Mr. Canda at the time you first met him in relation to this extension.  A. I asked him for an extension for those people in order for them to handle the property.

Q. What did Mr. Canda say in reply to your request? A. Well, he objected to extending it, but he did extend it, my recollection is, thirty days.

Q. Did you say to him for whom you were acting, whether for yourself alone or for somebody else?  A. I had no interest in it at all, but only acted for other parties.  He knew that.  We talked that all over.  He advised me as to what I thought they could do in handling it.  My recollection is I got an extension, and then a second extension some time in April of sixty days more. Then I got the extension in Mr. Wright's name.

Q. In April?  A. I think so, for Mr. Gamble—there were three, but I made the change myself.  Mr. Canda and myself talked it over, and we thought they had a

better chance to handle it, if Mr. Wright handled it himself, because he was in with the railroad people, and thought they could get Charlie Crocker in with them— Fred Crocker they called him then.

Q. Did Mr. Canda know that Mr. Wright was interested with the railroad company? A. He knew all about it, and talked to me about it, and told me just what had been done. We talked about it several times. He knew it was Mr. Gamble, Mr. Wright and Mr. Chadbourne. Then after the extension he knew it was Mr. Wright and the other two with him. * * *

There appears to have been no cross-examination of Mr. Hanchett on this point.

*Direct examination of C. J. Canda:* Q. Do you remember that it was in the contract? A. I don't remember that it is there, but it answers the purpose. On thinking the matter over, my memory is that Mr. Hanchett wrote to me that Mr. Gamble was entirely out of it, and still I would not go on with him until his contract had expired.

Q. He couldn't very well get out of it until February 1st, could he? A. He meant that he was not going to come up to time, and he didn't.

*Redirect examination of C. J. Canda:* Q. Recurring for a moment to the circumstances preceding and surrounding the making of the agreement of February 2, 1894, as I recall the sequence of events the options which preceded that expired on February 1, 1894? A. Yes, the one with Mr. Gamble.

Q. Is it not a fact that prior to February 2, 1894, you saw Mr. Hanchett and negotiated with him with respect to the contract or option which was executed on February 2, 1894? A. Nothing in a conclusive way.

Q. It was not concluded? A. No, sir; I told him I would not do anything until that Gamble contract had expired.

Q. That is, you told him you would not give him a contract? A. No, sir; would not have two contracts in exist-

ence with two people covering the same property at the same time.

Q. But the negotiations must have preceded February 2d, must they not?   A. I don't know that they did.

Q. What do you say in that regard whether that was so or not?   A. I don't know what you mean by negotiations.   I did not make him any terms of any kind, nature or shape.

Q. No conversation about the matter of making a contract?   A. I may have told him that contract would expire on a certain date, and after that we would deal with him. He told me very distinctly that Mr. Gamble was entirely out of it; that Gamble could not pay his share.

Q. He said that in connection with the February 2d contract?   A. Before we made that contract.   You can understand I was very particular that I was not going to have claims of two different people out.

Q. And also two writings covering the same property? A. Yes, at the same time.

Q. So that whatever was done you postponed the signing of any writing until after February 1, 1894?   A. Making any agreement.   I would not commit myself in any way until after that writing of Mr. Gamble had expired.

Q. Is it your best recollection now that you did talk with him about the contract before February 2d, or not? A. Certainly, he wanted the contract.

Q. So that you must have talked with him before that time?   A. Yes, but he very well understood I was committed to him in no way from any talk I had with him until the Gamble contract had expired.

Q. Was there any negotiation after February 1st, between you and him, or was it simply a matter of signing the contract?   A. Then we had to agree.   I would not agree before.   After that we had to agree.   The contracts were very much on the same line.

Q. Were there any specifications or terms of the contract left open?   A. There were none of them fixed.

Q. You had not arranged what contract you would give

him? A. No, and, as I believe, I told him on the contrary I would not do it.

Q. And you did not consider the question of the form of the contract you might give him after February 1st? A. I don't remember that we did. I didn't promise him any.

Q. Whatever contract you might give him, you did not consider the terms of it in any way? A. I don't remember that I did, and I don't believe I did. I was very particular on that particular point, although he assured me that Mr. Gamble had no interest whatever and would have none.

Q. Then, as I understand your testimony, it is that, so far as you now recall everything leading up to the making of the contract of February 2, 1894, preparation of the contract and execution of the contract, all transpired on that day—transpired after the first? A. I would not say on that day. It might have been later than that.

Q. And the plaintiffs' Exhibit 3 had not been prepared prior to February 2d? A. I don't believe it had.

Q. Have you any distinct recollection about that? A. I am perfectly positive it had not.   *   *   *

Q. Did you tell Mr. Hanchett that you would give a contract similar to the Gamble contract of November 13, 1893, to Mr. Wright as soon as the Gamble contract expired, if nothing was done about it? A. I told him distinctly I would not do anything until the Gamble contract expired. I would not be committed to giving him anything in any way at all after that.

Q. Did you tell him after it expired you would give him something? A. I expected to do something and he expected me to, but I was under no obligation to give it to him.

Q. You did not tell him you would do it after the other contracts expired? A. No, sir.

Q. Had you sent the contract, Plaintiffs' Exhibit 3, to Mr. John I. Blair before February 2, 1894? A. I don't think so.

Q. Are you absolutely certain of that?  A. I am quite certain of it because of the situation at that time.

Q. Did I understand you that the only point upon which you are absolutely clear with respect to the transaction evidenced by the contract of February 2, 1894, is that you committed yourself with respect to it in no way until after February 1, 1894?  A. That is the fact.

Q. Do you recall anything else in connection with the matter except that one fact?  A. In a general way the contract was made, and in fact, also, that Mr. Gamble would have no interest whatever with him.

Q. That Mr. Hanchett told you?  A. Yes, his contract would expire sure.

Q. Those are the only two things you remember distinctly in connection with the transaction?  A. In a general way, I met Mr. Hanchett and talked with him. I remember that he came specially on behalf of Mr. Wright.

Q. Do you remember anything else?  A. In a general way I remember about it.

There appears to have been no cross-examination of Mr. Canda on this point.

Relative to the Hanchett option the testimony is as follows:

*Direct examination of L. J. Hanchett:*  Q. Have you stated now all the extensions you got from Mr. Canda in the name of Mr. Wright?  A. I think so.

Q. Do you recall an extension in June?  A. Well, I got an extension, and my recollection is, I got an extension of thirty days the last of January; and at the expiration of that I got an extension of sixty days again.

Q. What happened at the expiration of those sixty days, or about that time?  A. Well, I took one in my own name.  *  *  *

*Cross-examination of L. J. Hanchett:*  Q. Was that bond given to you individually, Mr. Hanchett?  A. Yes.

Q. For and on your own behalf?  A. Yes, sir; I do not recall any other name but my own.  George Crocker's might have been in there, but I do not think so.  *  *  *

Q. Did you have any interest with Mr. Gamble, Mr. Wright and Mr. Chadbourne in the contract which you secured in your own name? A. Well, I took the contract and calculated to carry it through in my own name. I told Mr. Wright I would do what was right between Mr. Gamble, Mr. Chadbourne and himself on the contract.

Mr. Platt—You of course represented to Mr. Canda and the Silver Peak Mines people you were taking this contract in your own name and for your sole and exclusive benefit? A. The last contract?

Q. Yes, sir. A. Yes, sir.

*Redirect examination of L. J. Hanchett:* Q. Do you remember any such correspondence between Mr. Wright and Mr. Canda by telegram (telegrams of Wright and Canda of September 5, 1894), and letter as well which led ultimately to your taking this contract in your own name? A. I do not. I talked with Mr. Wright about it, and Mr. Wright read me several telegrams and several letters with Mr. Canda. I do not remember what they were now.

Q. You notice the telegram from Mr. Wright, as appears from the exhibit mentioned, was dated September 5th and the reply of Mr. Canda was also dated September 5, 1894; that it appears in testimony by Mr. Canda that he did receive from you a letter dated September 8, 1894, which I have just read to you a copy of a moment ago; that there was a reply from Mr. Canda to that letter of yours of September 8, 1894, Mr. Canda's reply being dated September 9, 1894; now, calling your attention to these various dates, can you state whether or not the change of the contract from the name of Mr. Wright to yourself did not come about at the suggestion of Mr. Wright? A. Well, I could not tell you how it came about.

*Recross-examination of L. J. Hanchett:* Q. Do you know as a matter of fact whether the contract given to you individually was an extension of the Wright contract or not? A. It was not. It was given before the Wright contract expired, signed by Mr. Canda, and left there until the expiration and then sent to me.

Q. Then I am to understand it was a separate and distinct contract to you individually and had no reference to any preceding contract entered into between the Silver Peak Mines and Mr. Wright or Mr. Gamble or Mr. Chadbourne?    A. The last contract was.

Q. Did you represent to Mr. Canda before you secured your last contract with the Silver Peak Mines Company that Mr. Gamble and Mr. Chadbourne were associated with you as partners in that contract?    A. I did not.    I represented to him that I was going alone on the last contract.

Q. Did you represent to Mr. Canda or the Silver Peak Mines Company that Mr. Wright was associated with you in that last contract?    A. No, sir; I did not represent to him that any one was associated with me.

*Cross-examination of Mr. Canda:* Q. I call your attention to Plaintiffs' Exhibit 36, your letter of September 19, 1894, to J. B. Wright; is that the letter in which you instructed Mr. Wright not to deliver to Mr. Hanchett until his contract of June, 1894, was returned?    A. Yes, sir.

Q. Now at the time of writing that letter to Mr. Wright and sending the contract with Mr. Hanchett, had you any information that Mr. Gamble had any interest whatever in the proposed contract with Mr. Hanchett?    A. None whatever.    On the contrary, I was informed by Mr. Hanchett that he did not.

Q. That he had no interest?    A. Had no interest.    I asked him.

Q. And at the time of sending that letter of September 19th, had you any information that Mr. Gamble had any interest in the contract therein referred to then existing between Silver Peak Mines and Mr. Wright?    A. No, none whatever.

There appears to have been no direct examination of Mr. Canda on this point.

It will be observed that, according to the testimony of Mr. Gamble given on direct examination relative to securing his second option of November 13, 1893, he gave

to Canda letters from at least two parties other than Chadbourne and Wright, to wit: J. E. Doolittle and D. A. Bender. These are two of the parties Gamble had informed Canda were interested with him in his letter of August 28, 1893. Gamble also states he may have given him letters from other parties at this time. None of these letters, either originals or copies, appear to have ever been found. What Mr. Gamble may have referred to in his testimony as a "proposition signed by them * * * that they would take up the mine under the following conditions and would furnish the money to finance it," was the proposition contained in his own letter of October 10, 1893, in which he says: "We will give you $500,000, payable $100,000 per year, and will erect mill and hoisting works, etc., all to revert to you in case we do not fill the contract. If you think favorably of this proposition, Messrs. Tarpey and Chadbourne will go to New York to confer with you." As will be seen from the correspondence set out in the statement of the case, this proposition led up to Mr. Gamble going to New York and ultimately obtaining the option of November 13, 1893.

Gamble further on in his cross-examination states that he furnished Canda with "letters from Mr. Wright and Mr. Chadbourne stating they were interested with me and had formed a partnership to take that matter up." No such letters appear in the evidence, and if Mr. Gamble's recollection is correct it is strange he did not refer to them in his letters to Canda of December 12 and 30, 1894. Gamble testified: "I asked him (Canda) to make a new contract with me." As to why Wright and Chadbourne were not made parties to the contract he said he could not tell further than that he had taken the contract in his own name for the benefit of the others.

Relative to the execution of the Wright contract of February 2, 1894, Hanchett testified that he talked the matter over with Canda, and that Canda "knew it was Gamble, Wright and Chadbourne. Then after the extension he knew it was Wright and the other two with him." Upon the other hand, Canda testified that Mr.

Hanchett told him that Gamble was out of it; that he could not pay his share.

Relative to the Hanchett contract, both Hanchett and Canda agree that Hanchett told Canda that he was alone interested in the option, and that he was taking it for his sole use and benefit. This testimony, like the other, should, however, be considered in the light of the correspondence at the time.

Taking all of the evidence in the case, we think it cannot be said to be established with any degree of certainty that Canda was informed of the alleged partnership relations existing between Gamble, Chadbourne and Wright as such partnership is sought to be established in this suit. That Canda knew that Wright and Chadbourne would be interested in aiding Gamble to carry out his second option there can be no question; but that they would be interested in any different way than a number of others whom Gamble had informed Canda were interested with him, such as D. A. Bender, M. F. Tarpey, Jeff Doolittle or Frank McLaughlin, does not appear to have been impressed upon Canda. The character of the second Gamble agreement and the first Wright agreement with Blair sheds possibly a little light on this question. These agreements were simply a guarantee upon the part of John I. Blair that, if a corporation was formed with a certain subscribed capital, the Silver Peak Mines would enter into a contract with such corporation. Neither Gamble nor Wright were supposed to be able to finance the proposition alone, and it was expected they would interest others with them. In fact, the representatives of the Silver Peak Mines were most anxious that they should do so, which accounts for the solicitude of Canda to know who Gamble's or Wright's or Hanchett's associates were; but it is a far-fetched proposition to try to bind the Silver Peak Mines by any claim of knowledge of a partnership relation existing between certain ones of these various associates mentioned.

Certainly we think vast property rights ought not to be lost upon the bare oral testimony of witnesses as to

their recollection of conversations had many years previous, when all the surrounding circumstances and documentary evidence in the case fails to furnish any corroboration of such testimony, but, upon the contrary, tends strongly to establish the very opposite as the real fact. Under such a condition as to the evidence as a whole, the only safe rule is to hold parties to the written agreements as they made them.

Even if it were conceded that Gamble and Hanchett made the statements to Canada, as testified to, which, to say the least, were very indefinite, there is no evidence whatever that Canda ever communicated the same to Blair or any of the other officers of the Silver Peak Mines. As the alleged partnership relation was an immaterial matter so far as the Silver Peak Mines was concerned in the making of these options, there was little or no reason why Canda should have communicated such a fact to his fellow-officers. Canda was particular upon his part to deal with but one person as a performing party, and it follows, in the absence of any proof to the contrary, that the Silver Peak Mines was dealing with but one performing party at a time.

When we look to the correspondence between the parties, we find nothing that warrants an inference that Canda was ever informed of any alleged partnership relations. In Gamble's letter to Canda of December 12, 1894, Gamble proceeds to tell Canda of the agreement or relations which existed between himself, Chadbourne, and Wright, as though the facts were entirely new to Canda, as they probably were. In Gamble's letter to Canda of December 30, 1894, Gamble says: "You say I did not post you. * * * It appears from your letters that you did not understand that I owned any interest in the contract after it was given to Wright. I now tell you that I did. * * * Of course, you did what you thought was right in transferring the contract to Hanchett." * * *

In Gamble's letter to Canda of January 11, 1895, he says: "These men were my partners, and I do not see

how they can make a contract on one side, without telling me, and then declare me out." In none of these letters is there an intimation that Canda had any previous knowledge of any alleged partnership relations existing between Gamble, Chadbourne and Wright; but, on the contrary, the expressions used are strongly evidentiary that Gamble knew that Canda had no such knowledge. Canda's letter to Gamble of date January 17, 1895, is also significant, wherein he says: "I do not see what more I can say to you than I have in my late letters, unless it is to add that it does not seem fair after you had abandoned, apparently, all interest and had failed to answer my letters, that you should appeal to me now to assist you in a matter over which I have no control."

Again in Canda's letter to Tarpey of October 7, 1895, appears the following: "I do not see, under the circumstances, what claims Mr. Gamble can have on Mr. Hanchett, particularly as before entering into arrangements with Mr. Hanchett I notified Gamble that his friends were not going on with the business."

There is nothing in the evidence warranting any conclusion of fraud or bad faith upon the part of the Silver Peak Mines towards Gamble or his associates. Gamble's letters and his original complaint are full of charges of bad faith towards himself upon the part of his alleged partners, but in none of his letters nor in the original complaint is there an intimation of such a charge upon the part of the representatives of the Silver Peak Mines.

With the contention of respondents, that in law their several options to Gamble, Wright and Hanchett should be regarded as one continuing option, we are unable to agree. The relationship of respondents towards the several contracts may have been substantially the same, but outside of the fact that one option followed the other and was of a similar nature, there is nothing else warranting treating all these transactions as one and the same rather than several independent agreements.

Two separate and distinct agreements were entered into with Gamble, and when his second option expired

the Silver Peak Mines were not satisfied to give him another option, but instead gave one to Wright. Wright transferred his option to Hanchett and requested the Silver Peak Mines to deal with him. Hanchett informed the company when he asked for an option in his name that he would take care of Wright and any others who were disposed to do their part on the financial end. It was well recognized by the Silver Peak Mines, when all these contracts or options were entered into, that the person who held the option would have to interest capital to assist him, but the company was particular to deal only with that person that it believed most likely to raise the necessary capital.

The Silver Peak Mines was particular in all its transactions not to have two options in existence at the same time, as is shown when the Wright and Hanchett options were executed.

"Where the parties to a contract have given it a particular construction, such construction will generally be adopted by the court in giving effect to its provisions. And the subsequent acts of the parties, showing the construction they have put upon the agreement themselves, are to be looked to by the court, and in some cases may be controlling." (9 Cyc. 588.)

An examination of the letters between Canda and Gamble, and particularly those written by Gamble, shows clearly, we think, that the parties themselves considered each several option as a separate and independent agreement, so far as Silver Peak Mines was concerned, regardless of what understanding respondents may have had among themselves. A few extracts from Gamble's letters will, we think, show this quite clearly.

From Gamble's letter of December 12, 1894, we quote: "After you had given the contract to Mr. Hanchett, Mr. Wright told me that he was satisfied that Mr. Hanchett could not raise the money and that Mr. Crocker would not advance it. Of course, I can hold Mr. Wright and Hanchett by law to give me the interest agreed upon. * * * Mr. Tarpey will take the contract with the pur-

pose of fulfilling its requirements, and with me organize a good company, and would have done so at the time the contract was given to Hanchett. * * * I could have carried out the contract now granted upon your property had I obtained it. * * * I desire you to understand that as soon as you granted Wright the contract I lost my power and was obliged to see them abuse your confidence. * * * Just learned that Hanchett is in New York City. Make him put up or give up the contract. We will put up the money."

From his letter of December 30, 1894, we quote: "They were still afraid of me and even after the contract was transferred to Hanchett he came here and told me that my interest was all right. * * * It appears from your letters that you did not understand that I owned any interest in the contract after it was given to Wright. * * * Of course, you did what you thought was right in transferring the contract to Mr. Hanchett, as Mr. Wright asked you to do so. * * * If you conclude that Mr. Hanchett cannot go on and you will give me the chance, I will have one of the richest firms on this coast make an application for the contract."

From Gamble's letter of January 16, 1905, we quote: "These people got in on my contract, that is I took Wright in and he took H. in, otherwise H. could have had no interest, as I would not have had anything to do with him, therefore I do not intend to allow H. to tell me I am 'out'—I shall tie him right up, and then we shall see who is telling the truth. * * * Mr. King and associates are willing to equip the property as I have told you. Now if H. and Wright are so fair and they have no one to back them, I would think they would say, 'We cannot fulfil the contract,' and so return it to you."

One cannot read the letters, telegrams and contracts which Canda wrote or negotiated as the representative of the Silver Peak Mines without being impressed with the strict business methods which characterized his actions. There is not the slightest warrant for a charge of fraud or double dealing upon the part of the Silver

Peak Mines. The company had a property to sell, and they gave written options thereon, none of which were ever complied with by the optionees, and it and its successors in interest ought not now be placed in the position of forfeiting the greater portion of this property upon any showing made by the evidence in this case.

Whatever rights Gamble, Chadbourne, or the Wrights had, they were subordinate to those of Hanchett, and were effectually cut off by the judgments obtained in the federal courts and relied on as a defense in this action. This view of the case makes it unnecessary to determine other questions raised, including that of considering the correctness of the various judgments rendered in the federal courts in the actions to which Hanchett was made a party.

While it may be conceded that the judgments rendered in the federal courts, and relied on by the appellants, would not be binding in the state courts in so far as they affected rights of persons who were not made parties to those actions, and whose rights were not subordinate to the rights of Hanchett, it is worthy of note that, in the recent opinion of Morrow, J., speaking for the Circuit Court of the United States, in the ancillary action brought in that court to enjoin the enforcement of the judgment in this case, in the opinion ordering a temporary injunction, it was said:

"Now, the question is whether this present suit is ancillary to the original foreclosure suit in this court, or is it an original suit? I am clearly of the opinion that it is ancilliary to the foreclosure suit. It is an action brought to protect the judgment of the circuit court in the foreclosure case. It has no other purpose. I have already stated that Hanchett was made a party to the foreclosure suit. He came in and made his answer, and in his answer he set up the agreement under which he claimed to have the right of possession of this mining claim, and there was a decree in that case adjudging that Hanchett and all persons claiming under him were without right or title or interest in the claim. That was a

direct adjudication not only upon Hanchett's right, but everybody claiming any right under the agreement of September 7, 1894. The option granted in that agreement had been exercised by Hanchett and exhausted. It makes no difference whether Hanchett was a partner or agent of parties who now seek to exercise the option provided in the agreement. The agreement is indivisible and has been discharged and is at an end. This court so held in its decree. Will this court now protect that decree? I do not see how it can do otherwise."

While not probable, it is true, as contended by counsel for respondents, that the conclusion of the federal court might be changed on the hearing for a permanent injunction, in the event this court affirmed the judgment of the lower court. We need not speculate upon this proposition here, nor should it, of course, have any bearing upon what should be the duty of a state court in a case where it deemed the judgment of a federal court erroneous in a case not binding upon parties before it, but, as we have hitherto pointed out, we consider these judgments binding upon the respondents for reasons independent of those considered in the opinion of Morrow, J.

Having reached the conclusion that the judgment in this case is without substantial evidence to support it, the judgment and order appealed from should be reversed.

Certain preliminary objections were interposed to a consideration of the transcript, but, upon examination, and without considering the contention of appellant that respondents have waived any right to object to the transcript, they are found to be without merit.

The objection that there is no statement on appeal from the judgment has no support, for the reason that counsel stipulated that the statement on motion for a new trial should also be considered a statement on appeal. Besides, the statement on motion for a new trial is ample for a consideration of all the questions involved.

The objection that the statement contains no certificate to the effect that it contains all the material evidence in the case is not well taken. Without considering the

sufficiency of the certificate, it is enough to say that, under the statute, the statement is "presumed to contain all the evidence and other matters pertinent to the proper presentation of the question or questions involved in said appeal or motion, unless the contrary affirmatively appears in such statement." (Comp. Laws, 3864.)

The judgment and order appealed from are reversed.

SWEENEY, C. J.: I concur.

[NOTE—Petition for rehearing pending in the foregoing case.]